IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EDWARD PRIMEAUX, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-05-224-C |
| | ) | |
| RANDALL G. WORKMAN, Warden, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent.[1] | ) | |

## **MEMORANDUM OPINION**

Petitioner, Edward Primeaux, a state court prisoner currently incarcerated pending the

execution of judgment and sentence of death, has filed a *Petition for a Writ of Habeas*

*Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254* (hereinafter "Petition").

(Dkt. Nos. 19, 21.) Petitioner, appearing with counsel, challenges the judgment and sentence

entered against him in Kay County District Court Case No. CF-2000-396, and Respondent

has responded. Petitioner has replied to this response. The state court record has been

supplied.[2]

---

[1] When this action was commenced, Mike Mullin was the warden of the Oklahoma State Penitentiary and the properly named Respondent. However, Randall G. Workman is the current warden of the Oklahoma State Penitentiary and the state officer having present custody of Petitioner. Thus, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court finds that Mr. Workman should be substituted for Mr. Mullin as the proper party Respondent. See Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("If the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody.").

[2] References to the parties' pleadings shall be as follows: Petitioner's *Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __); Respondent's *Response to Petition for Writ of Habeas*

# I.    PROCEDURAL HISTORY

A jury convicted Petitioner of two counts of Murder in the First Degree for the deaths of Warren Littlecook (hereinafter "Littlecook") and Julia Bear (hereinafter "Bear").  (O.R. at 438-39, 498-503.)  The jury recommended sentences of death on both counts.  (O.R. at 465, 467.)   The jury found four aggravating circumstances relating to both victims: (1) Petitioner was previously convicted of a felony involving the use or threat of violence to the person; (2) Petitioner knowingly created a great risk of death to more than one person; (3) the murder was especially heinous, atrocious, or cruel; and (4) there was a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society.  (O.R. at 464, 466.)  The jury found an additional aggravating circumstance in the case of Bear:  the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.  (O.R. at 466.)

Petitioner appealed his convictions and death sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA").  The OCCA affirmed Petitioner's convictions and sentence in a published opinion dated April 6, 2004.  Primeaux v. State, 2004 OK CR 16, 88 P.3d 893.  Petitioner's subsequent petition for writ of certiorari to the United States Supreme Court was denied on October 18, 2004.  Primeaux v. Oklahoma, 543 U.S. 944 (2004).

---

*Corpus* shall be cited as (Resp. at __); and Petitioner's *Reply* shall be cited as (Reply at __).

    References to the record shall be as follows:  The trial court's original record shall be cited as (O.R. at __); the trial transcript shall be cited as (Tr., Vol. ___, p. __); preliminary hearing transcript shall be cited as (Prelim., Vol. __, p. __); and pretrial motion hearing transcripts shall be cited as (Pretrial Motions, –/–/–, p. __).

Petitioner filed an Application for Post-Conviction Relief which the OCCA denied. Primeaux v. State, No. PCD-2002-632 (Okla. Crim. App. Apr. 13, 2004) (unpublished).

## II. FACTUAL BACKGROUND

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). For the purposes of consideration of the present Petition, the Court provides and relies upon the following synopsis from the OCCA's opinion summarizing the evidence presented at Petitioner's trial. Following review of the record, trial transcripts, and the admitted exhibits, the Court finds the OCCA's summary adequate and accurate. The Court therefore adopts the following summary as its own:

> [Littlecook] and [Bear] lived together at 812 North Pine in Ponca City, Oklahoma. They were found stabbed to death on Thursday July 6, 2000. The evidence revealed that Littlecook was initially stabbed in the chest with a knife, which severed a major artery. Then, he was stabbed six times in the back. Littlecook died as a result of a loss of blood from the initial stab wound, which severed his pulmonary artery. He also had four post-mortem stab wounds in the stomach. He had defensive wounds on his left hand.

> [Bear] was stabbed forty-one times. She was sitting in a wheelchair when she was attacked. She was stabbed one time each in front of both shoulders. She was stabbed once in the upper left quadrant of her abdomen. She was stabbed eight times below the right breast area (three of these punctured the liver, causing internal bleeding.) There were stab wounds to both hands. She was stabbed once in the right side of her back (one stab wound was to the chest cavity, which punctured the right lung and caused it to collapse). She was stabbed six times on the left side of her back (two of these entered the chest cavity and punctured the left lung and caused it to

collapse). She was stabbed four times in her left upper arm. She was stabbed seven times in the left rear side of her neck. She was stabbed six times on the left front side of her neck and face (one of these severed the left external carotid artery). There were two superficial stab wounds on the right side of her chin. A vacuum cleaner cord was wrapped once around her neck, but there were no signs of strangulation. She died as a result of multiple stab wounds.

An empty envelope was discovered next to a recliner. This envelope had contained the proceeds from Littlecook's monthly checks, which he received at the first of each month. One person described the amount in the envelope as a "large wad." Only $280.00 was recovered in the house. This money was hidden in a dresser drawer.

Testimony about the events leading up to their deaths revealed that the couple had cashed checks totaling about $1,400.00 on July 1st. They paid out just over $600.00 for rent and bills on that first weekend in July. Primeaux knew that the victims received checks on the first of the month.

Frank Kowalski delivered meals to Littlecook and Bear around noon on July 5. He didn't see Littlecook or Bear, but Littlecook said okay when Kowalski said, "here are your meals."

The morning of July 5th, Primeaux left his house with about $15.00 so he could get a new tire for his bike. He told several people that he didn't have much money. However, he did buy some quart bottles of beer that morning, after he couldn't find a tire. He joined friends who were also drinking beer. One of them saw him with a knife, carving on the picnic table. He then went to a bar where he got angry because his "friend" would not let him drink any more of the beer the friend purchased.

Later that evening, Primeaux arrived home and said that he stabbed a man and a woman. He said that he "tore a couple up real good." Primeaux and his family gathered his bloody clothes in a trash bag and took the bag to Kaw Lake where they attempted to burn the clothes. Primeaux gave a knife to Billy Roberson, his stepson, who threw the knife in the lake. They stopped at two stores on the way to the lake and bought beer, cigarettes and some gas to burn the clothes. Primeaux provided the money for these items. Later, partially burned tennis shoes and beer bottles were found at the lake where officers were told the clothes were burned.

One witness testified that Primeaux came by her convenience store that afternoon and bought some beer; although, he usually paid for the beer in exact change, this time he used a bloody twenty-dollar bill. She also testified that Primeaux bought a larger amount of beer than he usually bought (six quarts of Busch Beer at 3:30 p.m.) Primeaux returned twice more and bought nine more quarts of beer.

Primeaux testified that Randy Davis stabbed Littlecook because Littlecook refused to give him beer. Police questioned Randy Davis, he claimed to have knowledge of the crime, and he knew things about the crime scene, which proved to be true. However, his story did not match the way the murders were committed. He was initially charged conjointly with Primeaux, and bound over for trial, but charges against him were later dropped.

Primeaux, 2004 OK CR 16, ¶¶ 4-12, 88 P.3d at 898-99. Additional relevant facts from the record are provided where necessary.

## III.    PETITIONER'S CLAIMS FOR RELIEF

### A.    GENERAL CONSIDERATIONS:  Exhaustion and Procedural Bar

Federal habeas corpus relief is unavailable to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. § 2254(b); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994). In every habeas case, the Court must first consider exhaustion. Harris, 15 F.3d at 1554. "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). Generally, a habeas petition containing both exhausted and unexhausted claims is deemed a mixed petition requiring dismissal. Rose v. Lundy, 455 U.S. 509, 519 (1982); Fairchild v. Workman, 579 F.3d 1134, 1156 (10th Cir. 2009). Under the AEDPA, "[a]n application for a writ of habeas corpus may be denied on

the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2554(b)(2).

## B.    THE STANDARD OF REVIEW

Under the AEDPA, in order to obtain federal habeas relief once a state court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). "'A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent."'" Fairchild, 579 F.3d at 1139 (citations omitted); see also Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A state court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle

to a new context where it should apply." <u>Williams</u>, 529 U.S. at 407. Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Id.</u> at 412.

## C.    GROUNDS FOR RELIEF

### 1.    <u>Ground 1:  Exclusion of Statements Made by Randy Davis</u>

Petitioner argues his due process rights under the Fourteenth Amendment were violated when the trial court excluded statements made by Randy Davis ("Davis") as hearsay. (Pet. at 18-34.) Petitioner claims the statements were necessary to his defense and exclusion of the statements denied him a fundamentally fair trial.  In response, Respondent first argues Petitioner's claim is unexhausted.  Because the claim would be considered waived by the OCCA if brought before it, Respondent asserts that it must be deemed procedurally bared. (Resp. at 5-7.)  Secondly, and on the merits, Respondent submits that the OCCA decision was not contrary to, or an unreasonable application of, <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973).  (Resp. at 7.)  As discussed below, the Court disagrees Petitioner's first claim is procedurally barred, but nonetheless denies relief.

### a. Factual and Procedural Context

The substance of Davis's statements was admitted through the testimony of Detective Bob Stieber[3] at the preliminary hearing.[4] The trial court held extensive pre-trial hearings on the subject of the admissibility of the statements. A review of those proceedings and the preliminary hearing reveals the following.

Early in its investigation, law enforcement learned Davis had been drinking with Petitioner on the day of the murders. (Prelim., Vol. 1, p. 26.) Davis was brought to the Ponca City police station as a possible witness. (Prelim., Vol. 1, p. 28.) During the initial and subsequent interviews with police, Davis made a variety of statements that were indicative of his presence at the crime scene, but that were also contrary to the physical evidence.

### i. First Interview on Saturday, July 8, 2000

Davis said he was drinking a beer outside a neighbor's house when Petitioner came by. Together they went to buy more beer, drank it, and then left to go to Littlecook and Bear's house to get more money to purchase additional beer. (Prelim., Vol. 2, pp. 80-82.) Davis did not enter the home, but stayed on the sidewalk while Petitioner was let inside by Bear. He heard an argument over money, but remained on the sidewalk and did not see what

---

[3] The OCCA's opinion spells the detective's name as "Steiber." A review of the record indicates the proper spelling to be "Stieber." (Tr., Vol. 6, p. 65.) The Court declines to alter every occurrence of "Steiber" throughout its quotations to the OCCA opinion.

[4] The record reflects that Davis's statements were recorded on video. (Pretrial Motions, 10/1/2001, p. 4.) However, the recordings were not part of the state court record.

happened inside. After about thirty minutes, Petitioner emerged from the home and had a little blood on his shoe. Davis said that he did not receive any money. (Prelim., Vol. 2, p. 85.) Davis was allowed to leave at the end of this interview and was not considered a suspect. (Prelim., Vol. 2, p. 80.)

### ii. Second Interview on Monday, July 10, 2000

Davis's next interview took place the following Monday when he was requested to come back to the station to answer more questions. (Prelim., Vol. 2, p. 87.) Davis again stated that he and Petitioner went to Littlecook and Bear's home to try to get some money. He recalled waiting on the sidewalk while Petitioner knocked on the door and was let in by Bear. Davis heard Petitioner argue with Littlecook and Bear about money and the arguing turned into screaming. After about fifteen minutes, Petitioner emerged from the house with blood on his pants from the knee down. Davis recalled seeing blood on the porch of the home. When asked to describe how the blood got on the porch, Davis said he saw Littlecook come out of the house, followed by Petitioner. Petitioner then got in front of Littlecook and stabbed him in the chest. Littlecook fell down and Petitioner stabbed him again. Petitioner grabbed Littlecook by his feet and dragged him inside the home. Davis again stated that he did not receive any money from Petitioner. (Prelim., Vol. 2, pp. 91-94.)

At this point in the interview, Davis was asked to take a polygraph examination. (Prelim., Vol. 2, p. 94.) When Davis was told that he did not do well on the polygraph examination, he said, "Okay, I'm going to tell the truth now." (Prelim., Vol. 2, p. 100.)

### iii.    Third Interview on Monday, July 10, 2000

Shortly after the second interview, Davis was interviewed again. He said that he was not on the sidewalk as previously stated, but instead was on the porch. During the interview, detectives told Davis they did not believe he was on the porch, but rather that he was inside the house. Davis then admitted he had gone inside the house a few minutes after Petitioner was let inside. At the time, Petitioner and Littlecook were arguing about money. Davis saw Petitioner take a brown envelope from between the arm and the cushion of a chair that was in the middle of the living room. Littlecook was upset about Petitioner taking the money and Petitioner stabbed Littlecook. Littlecook fell down and tried to get out the front door. Petitioner grabbed Littlecook, dragged him back in, and stabbed him several more times. Davis said that Petitioner then stabbed Bear as she sat in the wheelchair. Bear fell out of her chair and Petitioner continued to stab her. (Prelim., Vol. 2, pp. 100-02.)

Detectives asked if there was anything else that Petitioner did to Bear in an attempt to see if Davis was aware of a cord wrapped around Bear's neck (which was not public knowledge). Davis said Petitioner raped Bear. According to Davis, Petitioner lifted Bear's dress up and began "humping" her. As to his knowledge about the cord found around Bear's neck, Davis said that Petitioner had "poked a hose through her neck." (Prelim., Vol. 2, pp. 102-05.)

When asked about the knife used in the stabbing, Davis initially said that he could not remember where it came from, but eventually said he took his father's knife with him when he and Petitioner initially left to go drink beer. According to Davis, Petitioner took the knife

and used it in the attack.  Davis said that he received fifty dollars from Petitioner after the stabbing.  Before the end of the interview, a detective confronted Davis and asked, "You raped her, didn't you?"  Davis initially denied sexually assaulting Bear, but later admitted that he "made love" to Bear.  Davis stated that Bear had been stabbed once in the stomach and had fallen out of her chair.  Once she fell from her chair, he took off her underwear and "made love to her" while Petitioner stabbed Littlecook.  Davis admitted to penetrating Bear, but stated he was unable to ejaculate.  During this interview, Davis did not admit to any stabbing.  (Prelim., Vol. 2, pp. 106-10.)

At the conclusion of this interview, Davis was arrested and processed in connection with the murders.  (Prelim., Vol. 2, p. 110.)

### iv.     Fourth Interview on Monday, July 10, 2000

Initially, Davis denied stabbing Bear when accused by the officers.  (Prelim., Vol. 2, p. 112.)  However, in the subsequent interview, investigators told Davis that he would not be in any more trouble if he admitted his involvement in the killings, to which Davis replied, "Okay, I did it."  (Pretrial Motions, 10/1/2001, p. 12.)  Davis admitted to stabbing Bear. Davis maintained that Petitioner had already stabbed Bear before he raped her, but he admitted to stabbing Bear multiple times in her upper body, abdomen, and chest.  He said that Petitioner stabbed Bear in the neck.  When asked to describe Bear's location during the attack, Davis said that Bear was in front of the couch, to the left of the front door, when he sexually assaulted her.  Davis rose to his feet and Bear crawled towards the heater.  Davis got the knife from Petitioner and went to Bear and stabbed her.  When asked why he stabbed

Bear, Davis said that Petitioner told him to do so.  (Prelim., Vol. 2, pp. 112-14.)  At one point, Davis stated that he amputated Bear's legs.  (Pretrial Motions, 10/1/2001, p. 19.)  Davis left and bought two 30-packs of beer and ten packs of cigarettes with the fifty dollars Petitioner gave him.  (Prelim., Vol. 2, p. 115.)

### v.    Fifth Interview on Tuesday, July 11, 2000

Police interviewed Davis again on Tuesday, July 11, 2000, to determine if he could identify the knife that was used in the attacks.  Davis was asked to draw a picture of the knife.  Davis initially said that Petitioner threw the knife into a yard, but later said that he took the knife home and gave it to his father.  Police found a knife in a dresser in the home of Davis's father.  Davis also said that the clothes he wore during the attack were now in a box.  (Prelim., Vol. 2, pp. 116-18.)  Davis identified the knife recovered from his father's home as the knife used in the attacks.  (Prelim., Vol. 2, p. 120.)

### vi.    Trial Court Proceedings

Davis was charged with Petitioner in the murders of Littlecook and Bear.  Davis was later deemed incompetent to stand trial.  Primeaux, 2004 OK CR 16, ¶ 53, n.1, 88 P.3d at 904 n.1.  He was unavailable to testify at Petitioner's trial.  (Pretrial Motions, 10/1/2001, p. 43.)

Prior to Petitioner's trial, the State filed a Motion in Limine to determine the admissibility of any and all of Davis's statements made to police officers.  (O.R. at 321.)  Petitioner filed a response and sought to admit Davis's statements under two theories.  (O.R. at 341-44.)  First, Petitioner argued Davis's statements were not hearsay because they were not offered for the truth of the matter asserted, but rather, they were offered to demonstrate

that through his statements to law enforcement, Davis gradually inculpated himself and exculpated Petitioner. (O.R. at 341-42.) Secondly, Petitioner argued the statements were admissible under the statement-against-interest exception found in 12 Okla. Stat. § 2804(B)(3)(2001).[5] (O.R. at 342-43.) The trial court held a hearing on the motion on October 1, 2001. (Pretrial Motions, 10/1/2001, pp. 1-76.) After reviewing the videotaped interviews and hearing argument from counsel, the trial court ruled that Davis's statements were inadmissible hearsay. (Pretrial Motions, 10/1/2001, pp. 4, 42-45.) The trial court found that the statements were untrustworthy because of the lack of forensic evidence linking Davis to the crime, his obvious error in recalling certain details, the change in positions throughout the different interviews, and that the statements did not provide any other information that would not have been known to someone merely present at the scene. (Pretrial Motions, 10/1/2001, pp. 43-44.)

### vii.    Direct Appeal

On direct appeal, Petitioner argued the trial court erred by concluding that Davis's statements were hearsay when the statements were not offered for the truth of the matter

---

[5] 12 Okla. Stat. § 2804(B) reads in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . . [a] statement which was at the time of its making contrary to the declarant's pecuniary or proprietary interest, or which tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, and which a reasonable person in the declarant's position would not have made unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. A statement or confession offered against the accused in a criminal case, made by a codefendant or other individual implicating both the codefendant or other individual and the accused, is not within this exception[.]"

asserted.  (Petitioner's Brief on Direct Appeal, pp. 26-30.)  Additionally, Petitioner argued the exclusion of Davis's statements violated his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial under <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973).  (<u>Id.</u> at 31-35.)  The OCCA disagreed and affirmed the trial court's exclusion of Davis's statements.  <u>Primeaux</u>, 2004 OK CR 16, ¶¶ 31-54, 88 P.3d at 901-04.  The OCCA first determined that Davis's statements were offered for the truth of the matter asserted.  <u>Id.</u>, ¶¶ 39-45, 88 P.3d at 902-03.  The OCCA then rejected Petitioner's argument that the exclusion of Davis's statements violated his constitutional rights to present a complete defense.  <u>Id.</u>, ¶¶ 49-54, 88 P.3d at 903-04.

### b.    Analysis

Respondent first argues Petitioner's claim for relief is procedurally barred.  (Resp. at 5-7.)  According to Respondent, Petitioner argues, "[T]he statements were trustworthy and, therefore, should have been admitted, apparently as statements against Davis'[s] penal interest, which are excepted from the hearsay rule."  (<u>Id.</u> at 5.)  The OCCA held that Petitioner did not challenge the trial court's ruling that the statements were untrustworthy and therefore not excluded from hearsay under 12 Okla. Stat. § 2804(B)(3).  <u>Primeaux</u>, 2004 OK CR 16, ¶¶ 35-36, 88 P.3d at 902.  Respondent submits that Petitioner's claim before this Court was not properly raised on direct appeal (or in his claim for post-conviction relief), and since the OCCA would now consider the claim waived if asked to consider it, this Court is precluded from addressing the claim.  (Resp. at 6-7.)  However, Petitioner properly raised his <u>Chambers</u> claim on direct appeal.  (Petitioner's Brief on Direct Appeal, pp. at 31-35.)

Primeaux, 2004 OK CR 16, ¶¶ 49-54, 88 P.3d at 903-04.  Indeed, the OCCA denied relief

on Petitioner's Chambers claim.  Primeaux, 2004 OK CR 16, ¶¶ 49-54, 88 P.3d at 903-04;

see also id., ¶¶ 49-55, 88 P.3d at 927-930 (Chapel, J., dissenting) (disagreeing with majority

on application of Chambers).  Petitioner's claim for relief is properly before the Court.

In its opinion denying relief, the OCCA held:

> [Petitioner] also claims that the exclusion of this evidence based on
> strict adherence to the rules of evidence deprived him of due process.
> [Petitioner] claims that the exclusion of this evidence deprived him of evidence
> essential to his defense.

> [T]o determine whether a defendant was unconstitutionally
> denied his or her right to present relevant evidence, we must
> balance the importance of the evidence to the defense against
> the interests the state has in excluding the evidence.

Richmond v. Embry, 122 F.3d 866, 872 (10th Cir. 1997), cert. denied, 522
U.S. 1122, 118 S.Ct. 1065, 140 L.Ed.2d 126 (1998).

> To establish a violation of . . . due process, a defendant must
> show a denial of fundamental fairness. . . .  It is the materiality
> of the excluded evidence to the presentation of the defense that
> determines whether a petitioner has been deprived of a
> fundamentally fair trial.  Evidence is material if its suppression
> might have affected the outcome.  In other words, material
> evidence is that which is exculpatory-evidence that if admitted
> would create reasonable doubt that did not exist without the
> evidence.

Ellis v. Mullin, 326 F.3d 1122, 1128 (10th Cir. 2002), cert. denied, 540 U.S.
977, 124 S.Ct. 430, 157 L.Ed.2d 331 (2003) (quoting Richmond, 122 F.3d at
872).

> In Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35
> L.Ed.2d 297 (1973), the United States Supreme Court held that the exclusion
> of evidence which bears "persuasive assurances of trustworthiness" may not

be excluded based on a mechanistic application of the rules of evidence when that evidence is critical to a defendant's case.

The Court in Chambers expressly stated that the ruling was based on the facts and circumstances of the Chambers case and the rule did nothing to diminish the ability of States to establish their own criminal rules and procedures. Id.

In Chambers, the appellant was not allowed to impeach his own witness (who had confessed to the crime and later recanted), nor was he allowed to call witness[es] that would say that the witness confessed to them. Unlike Chambers, in this case, [Petitioner] did not call Davis as a witness because he was unavailable, so he attempted to introduce Davis's statements to police.

The State has an interest in preventing wholly unreliable and possibly perjured evidence from being introduced at trial. See Chambers, 93 S.Ct. at 1048. [Petitioner] admits that Davis's statements bear no assurances of trustworthiness. The statements were made after detectives lead him down a golden path of leading questions and interrogation. Davis, as an incompetent individual, was willing to tell the police exactly what they placed in his mouth. Davis's statements do not meet the "persuasive assurances of trustworthiness" standard that must be met in order to overcome evidentiary rules excluding such evidence.

Furthermore, there is no indication that Davis's statement would create a reasonable doubt where none existed before. Therefore, the trial court correctly concluded that the statements were inadmissible. [Petitioner's] due process rights were not violated by the trial court's ruling.

Primeaux, 2004 OK CR 16, ¶¶ 49-54, 88 P.3d at 903-04 (footnote omitted).

Petitioner's claim challenges a state court evidentiary ruling. Generally, state evidentiary decisions do not present federal constitutional issues. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (citation omitted). However, as discussed in the OCCA's opinion, certain evidentiary decisions may render a trial fundamentally unfair in violation of

the Fourteenth Amendment.  See Chambers, 410 U.S. at 302-03.  In Chambers, the Supreme

Court concluded Chambers was denied his due process right to a fair trial.  Id. Chambers was

convicted of murdering a police officer who was shot while attempting to execute a warrant

in the midst of a large, hostile crowd.  Id. at 285.  Before dying, the police officer was able

to fire into the crowd and hit Chambers, who was later charged with the murder.  Id. at 286-

87.  Another man, Gable McDonald, was also present during the shooting and admitted

responsibility.  Id. at 287.  McDonald gave a sworn confession to Chambers' attorneys and

told others he had shot the police officer.  Id.  However, McDonald later repudiated his

sworn confession.  Id. at 288.  At trial, the trial court prohibited Chambers from examining

McDonald as an adverse witness about his confession or from producing testimony of

McDonald's confession from three witnesses.  Id. at 291-92.  On writ of certiorari, the

Supreme Court concluded that "the exclusion of [the reliable hearsay] evidence, coupled with

the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in

accord with traditional and fundamental standards of due process."  Id. at 302.  In particular,

"The hearsay statements involved in this case were originally made and subsequently offered

at trial under circumstances that provided considerable assurance of their reliability."  Id. at

300.  However, even though the Supreme Court found a due process violation based upon

the operation of state evidentiary rules, the holding was expressly limited:

> In reaching this judgment, we establish no new principles of constitutional law.
> Nor does our holding signal any diminution in the respect traditionally
> accorded to the States in the establishment and implementation of their own
> criminal trial rules and procedures.  Rather, we hold quite simply that under

the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

Id. at 302-03.

Two Tenth Circuit cases have applied Chambers in the context of federal habeas review. See Ellis v. Mullin, 326 F.3d 1122, 1128 (10th Cir. 2002); Richmond v. Embry, 122 F.3d 866, 871-72 (10th Cir. 1997). The OCCA's decision cited the appropriate tests from Ellis/Richmond, and relied upon Chambers. Primeaux, 2004 OK CR 16, ¶¶ 49-54, 88 P.3d at 903-04. After a review of the record, the Court finds that the OCCA's application of Chambers to Petitioner's claim was not unreasonable.

Initially, the Court recognizes the OCCA's implicit conclusion that the State's interest in excluding unreliable evidence outweighs Petitioner's interest in its admittance. Id., ¶ 53, 88 P.3d at 904. The test on habeas review is not whether the Court agrees with the state court determination, but whether the determination "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). See McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003) ("[W]e are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly. Rather, we must be convinced that the application was also objectively unreasonable."). As the Court explains infra, because Davis's statements to the interviewing police officers were unreliable and

unsupported by physical evidence, it is not unreasonable to conclude that the State's interest in excluding this evidence outweighed the value of the evidence to Petitioner's defense, especially in light of all the evidence presented at Petitioner's trial.

Petitioner argues Davis's statements are relevant and material to his defense. (Pet. at 25.) The Court agrees the statements are relevant inasmuch as they establish Davis was present at the scene and had knowledge of the crime that was unavailable to the public. Indeed, the trial court found the statements were corroborated to the extent that it was likely Davis was at the scene at the time of the murders. (Pretrial Motions, 10/1/2001, p. 28.) However, apart from his presence at the scene, a review of the record reveals no physical evidence that supports the version of events as described in Davis's statements in which he states he raped and stabbed Bear. In fact, there are significant discrepancies between the physical evidence and Davis's evolving narrative of the crimes. For example, the trial court noted the lack of any corroborating fingerprints, bloodstains on Davis or his clothing, or any other corroborating testimony. (Id. at 28-29.) Davis claimed he raped Bear, but there was no evidence of sexual assault. (Id. at 17-18.) Davis also claimed he amputated Bear's legs and inserted a hose through her neck. Bear's legs were not amputated, nor was a hose inserted through her neck. (Id. at 14-15.) The trial court's ruling highlights the reasons for the exclusion of the statements:

> The question is, is there corroborative evidence that indicating it's clear – that clearly indicates that it's trustworthy. I cannot make that finding. I am not sure what Mr. Davis'[s] frame of mind was as he was making these statements over these two or three days, why he continued to confess to things, what he would have confessed to if he would have been continually examined

19

after his admission of his purported stabbing of Ms. Bear, had he been – had the examination continued, would he have admitted to the murder of [Littlecook]. For that matter, if he had continued to be examined, would he have admitted to the Oklahoma City bombing. I just don't know where he is going, what his mind-set was in – and why he was saying what he was saying. And there is nothing that we can say that we can prove he, in fact, committed that murder, because there was [sic] fingerprints, there was blood, there was something that show that he, in fact, perpetrated that.

(Id. at 44.)

Petitioner does not argue Davis's statements include "persuasive assurances of trustworthiness," Chambers, 410 U.S. at 302, but rather that he was "whipsawed" on the issue of trustworthiness. Petitioner complains that the statements were trustworthy enough for the continued police investigation of Davis, his arrest, and his subsequent bind-over on the charges of capital murder. (Pet. at 25-26.) However, Petitioner has not demonstrated that the State's actions entitle him to relief under clearly established federal law.

Petitioner's reliance upon Ellis for relief is unavailing. In Ellis, 326 F.3d at 1129-30, the Tenth Circuit granted a writ of habeas corpus after concluding that the state court exclusion of a mental health report deprived Ellis of his due process right to present evidence in his defense. However, the Tenth Circuit reviewed Ellis's Chambers claim de novo, declining to afford the state court determination deference under 28 U.S.C. § 2254(d). Id. at 1128 (applying de novo review because the OCCA upheld exclusion of evidence without referencing the petitioner's Chambers claim); see also Harris v. Ward, No. CIV-02-624-F, 2003 WL 22995021, at *15 (W.D. Okla. Nov. 12, 2003) (unpublished) (recognizing

application of de novo review in <u>Ellis</u>). As a result, the Tenth Circuit was unconstrained by the narrow standard of review this Court must apply to Petitioner's claim.

Here, the OCCA determined that admission of Davis's statements would not necessarily create reasonable doubt where none had existed before. A review of the evidence presented at trial confirms that this determination was not unreasonable. 28 U.S.C. § 2254(d)(2).

In addition, Petitioner was able to insert Davis's culpability into the jury's deliberations. During Petitioner's first stage opening and closing statements, and his second stage closing argument, Petitioner argued Davis was responsible party. (Tr., Vol. 4, p. 29; Tr., Vol. 7-A, 40; Tr. Vol. 9, p. 178-79.) The jury heard evidence of Davis's statements to police and his arrest. However, during trial, the State presented overwhelming evidence of Petitioner's guilt. Petitioner's bloody fingerprint was found at the scene. A convenience store clerk testified that Petitioner paid for beer with a bloody twenty dollar bill. The jury heard Billy Roberson's testimony in which he recalled Petitioner's statement that he had "gotten into a fight and tore some people up pretty good." (Tr., Vol. 5, pp. 190-91; Court's Exhibit 1, p. 96). Mr. Roberson also detailed the burning of Petitioner's clothes and disposal of the pocketknife. Petitioner has not demonstrated that the OCCA's conclusion that admission of Davis's statements would have created reasonable doubt where none had existed before was unreasonable. <u>See</u> <u>Richmond</u>, 122 F.3d at 874 ("[I]n light of the evidence of Mr. Richmond's guilt, 'in the context of the entire record,' we are not persuaded the proffered testimony, even if admitted, would have created a reasonable doubt that did not

exist without the evidence." (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 868 (1982))).

Given the discrepancies between Davis's version of events from his statements and the forensic evidence, Davis's statements lacked the "persuasive assurances of trustworthiness" necessary to the Court's holding in Chambers. Accordingly, the state court's application of Chambers survives review under 28 U.S.C. § 2254(d). See Christian v. Frank, 595 F.3d 1076, 1083-86 (9th Cir. 2010) (holding state court's application of Chambers was not unreasonable), petition for cert. filed, No. 10-6035 (U.S. Aug. 17, 2010). Petitioner's first ground for relief is denied.

### 2. Ground 3: Prosecutorial Misconduct in Eliciting Testimony from Lead Detective[6]

In his third ground for relief, Petitioner argues the prosecutor elicited false testimony relating to Davis's statements and subsequently capitalized upon that testimony in closing arguments. Petitioner alleges these actions resulted in a violation of Petitioner's constitutional right to a fundamentally fair trial under the Eighth and Fourteenth Amendments. (Pet. at 42-50). The OCCA reviewed Petitioner's claim for plain error and denied Petitioner relief on the merits. Primeaux, 2004 OK CR 16, ¶¶ 55-57, 88 P.3d at 904-05. Respondent argues the OCCA's decision is not contrary to, or an unreasonable application of, clearly established federal law. (Resp. at 18-21.)

---

[6] The Court addresses Petitioner's second ground for relief out of the order presented because it is closely related to his first claim.

The OCCA addressed Petitioner's claim as follows:

> In a proposition relating to Randy Davis as a possible suspect in this crime, proposition four, [Petitioner] complains that the State introduced misleading testimony of Detective Steiber. The State asked Steiber if he knew of any piece of physical evidence or statements made to third parties that would tie Randy Davis to what happened to the victims. Steiber answered, "absolutely none." This answer came during redirect examination. [Petitioner] did not object to the testimony, nor did he re-cross-examine Steiber on this answer. [Petitioner] now claims that the testimony amounted to State sponsored perjury, which deprived him of constitutional rights. Because there was no contemporaneous objection at trial, we review for plain error only. See Simpson v. State, 1994 OK CR 40, ¶ 10, 876 P.2d 690, 694.

> Steiber was the lead detective on this case. During cross-examination, [Petitioner] was able to elicit testimony that Randy Davis was arrested as a suspect in this case. He was able to elicit testimony that probable cause had to be established before Randy Davis was arrested. It was established that no warrant was obtained but that someone in law enforcement had probable cause to arrest him. Testimony was also elicited that Davis made statements to the police and by the time of the last statement he was under arrest for the crime. Testimony was elicited that Randy Davis was charged with this crime.

> Taken in context the detective's answer may well have been correct. Davis made statements to the investigating police, but he made no statements to "third parties" when defined as parties not involved in a transaction (or interrogation). Moreover, Steiber, at the time of trial, may well have believed that Randy Davis's statements were not reliable or trustworthy, thus his opinion that there was no credible evidence linking Davis to the crime. There was no plain error here.

Primeaux, 2004 OK CR 16, ¶¶ 55-57, 88 P.3d at 904-05.

Claims of prosecutorial misconduct require the Court to determine whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and

must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (footnote omitted); <u>see, e.g.</u>, <u>Miller v. Pate</u>, 386 U.S. 1 (1967); <u>Pyle v. Kansas</u>, 317 U.S. 213 (1942). The prosecutor's statements "must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." <u>United States v. Young</u>, 470 U.S. 1, 11 (1985). "When specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." <u>Donnelly</u>, 416 U.S. at 643. The Tenth Circuit has held:

> [There is] an important distinction between an ordinary claim of prosecutorial misconduct, which warrants habeas relief only when the entire proceeding is rendered fundamentally unfair, and a claim that the misconduct effectively deprived the defendant of a specific constitutional right, which may be the basis for habeas relief without proof that the entire proceeding was unfair.

<u>Paxton v. Ward</u>, 199 F.3d 1197, 1217 (10th Cir. 1999). <u>See also</u> <u>Torres v. Mullin</u>, 317 F.3d 1145, 1158-59 (10th Cir. 2003). Petitioner does not allege the prosecutor's conduct deprived him of a specific constitutional right apart from the right to a fundamentally fair trial. Therefore, Petitioner's claim is subject to general due process review. <u>Donnelly</u>, 416 U.S. at 643.

Petitioner's claim centers on the testimony of Det. Stieber, the chief investigator. The relevant exchange between Det. Stieber and the prosecutor is produced here in context:

> Q:      Detective Stieber, again, as the chief investigator in this matter, was [dismissing the charges against Davis] based upon the evidence as you knew it to be at that time?

A:     Yes, sir.

Q:     And at the time the charges were dismissed against Randy Davis, did you, likewise, agree that that was the right thing to do?

A:     To dismiss the charges?

Q:     Yes, sir.

A:     Absolutely.

Q:     Detective, I think I just have one final question, in two parts. You've sat through this trial, you've heard evidence of fingerprints, of statements made, allegedly, by [Petitioner] to third parties, of bloody twenty dollar bills connected to [Petitioner]–in other words, you've heard evidence, that you became aware of during this investigation, that would suggest that [Petitioner] was involved in this. Is that correct?

A:     That is correct.

Q:     As you sit here today, Detective, do you know of any, any piece of physical evidence or statements made to third persons, whatsoever, that would tie Randy Davis to what happened to Warren and Julia?

A:     Absolutely none.

(Tr., Vol. 6, pp. 135-36.)

Petitioner asserts that Det. Stieber's testimony was false, citing Davis's inculpating statements made to police, his failed polygraph examination, and the preliminary hearing in which he was bound over for trial on two counts of capital murder. (Pet. at 43.) The OCCA disagreed and held that when taken in context, the testimony may have been correct. Primeaux, 2004 OK CR 16, ¶¶ 57, 88 P.3d at 904-05.

The OCCA's determination is not unreasonable. Immediately before Det. Stieber testified that Davis had not made statements to third parties, he testified he knew of statements that Petitioner had made to third parties. For example, Petitioner told his wife that he "tore up a couple real good." (Tr., Vol. 5, pp. 190-91; Court's Exhibit 1, p. 96.) Shawn Fiarris testified Petitioner said he stabbed a man and woman. (Tr., Vol. 5, pp. 45-48.) In its context, therefore, it is not unreasonable to conclude that Det. Stieber's testimony was accurate. There was no evidence that Davis had made statements to third parties such as family members or acquaintances. In addition, the jury was aware Davis made statements to law enforcement through the earlier testimony of Det. Stieber on cross-examination. Det. Stieber testified that before Davis made statements, he was not suspected in the murders, but at their conclusion, he was arrested and subsequently charged in the murders. (Tr., Vol. 6, pp. 123-24.)[7] In sum, the prosecutor's question and Det. Stieber's response do not rise to a

---

[7] To the extent Petitioner argues that the prosecutor elicited perjured testimony with respect to any physical evidence linking Davis to the crime, Petitioner does not directly assert that physical evidence linking Davis to the murders exists. Rather, his Petition contains passing references to a knife found in the home of Davis's father, presumably to insinuate that the knife may have been used in the killings. (Pet. at 28-29.) A review of the record confirms the OCCA's conclusion that Det. Stieber believed, "there was no credible evidence linking Davis to the crime." Primeaux, 2004 OK CR 16, ¶ 57, 88 P.3d at 904-05. The State's medical examiner testified that the deepest stab wound suffered by Littlecook and Bear was about four inches deep and about half an inch or an inch wide. (Tr., Vol. 4, pp. 191, 200.) Multiple witnesses testified that Petitioner had a knife, described as a pocketknife, lockblade, and three to four inches long. (Tr., Vol. 5, pp. 61-62, 178, 190-91; Court's Exhibit 1, pp. 108-09.) Police recovered a different knife belonging to Davis's father, which was admitted into evidence. (Tr., Vol. 6, p. 134.) While it is unclear from the record exactly how large the knife is, it was described as "large" and "more than one-half inch wide." (Prelim., Vol., 1, p. 79.) Indeed, the prosecutor, during closing argument stated, "I suggest to you that when you all look at that knife, you'll see that it's about twice the size of a four-inch blade. When you remember Dr. Balding's testimony that not a single one of [Bear's] wound[s] was more than a half inch wide, even the three and four-inch deep wounds, it doesn't take you very long to see that this knife did not kill

(continued...)

"knowing use of perjured testimony" giving rise to a constitutional violation. <u>Agurs</u>, 427 U.S. at 103.

Petitioner draws attention to the following statement made during the State's closing argument:

> That's what this trial has been about, folks. I didn't do it. *Some unknown white guy, that according to the lead detective in this case, there is not one shred of physical evidence to tie him to this crime* – some guy that he said, "I don't really know him, he's [Red Davis's] kid, I have nothing to do with him, don't particularly like him, we're certainly not friends – and yet I'm willing to sit in jail for nineteen months and face a first degree murder trial and, if, in fact, convicted, face the punishments you would deal with, and never, ever speak up and say, "Wait a minute, I don't think that's the path I want to take for some scum-bag white guy that killed my dearly beloved friends." That's what doesn't work, folks. That's the idea that doesn't work.

(Tr., Vol. 7A, p. 64) (emphasis added). According to Petitioner, the prosecutor took advantage of Det. Stieber's testimony and the trial court's exclusion of the substance of Davis's statements, giving rise to a constitutional violation similar to that in <u>Paxton</u>, 199 F.3d at 1218.

In <u>Paxton</u>, during the second stage of the defendant's first degree murder trial, the State presented evidence of the prior murder of the defendant's wife. <u>Id.</u> at 1203. The defendant was initially charged with homicide, but the State dismissed the charges after he was cleared by a polygraph examination. <u>Id.</u> However, relying on a state law prohibiting the admission of polygraph results in any circumstances, the trial court did not allow the

---

[7] (...continued)
[Bear]." (Tr., Vol. 7A, p. 27.)

defense to present the reason for the dismissal. The State presented statements of the defendant's daughter which had implicated him in the murder, over the defendant's hearsay objection. Additionally, at closing argument, the prosecutor both denied knowing the reason for the dismissal of charges and insinuated that the charges may have been dropped because the defendant's daughter was afraid to testify against her father. The jury fixed the defendant's sentence at death. Id. On federal habeas review, the Tenth Circuit held: (1) the admission of the daughter's statement violated the defendant's rights under the Confrontation Clause of the Sixth Amendment; (2) the exclusion of the polygraph examination violated the defendant's right to present mitigating evidence; and (3) the prosecutor's comments during closing argument violated the defendant's right to explain or deny the evidence against him.

Id. at 1211, 1215-16, 1218. The Court reasoned:

> [T]he mechanistic application of a per se evidentiary rule operated to exclude evidence that proceedings against Mr. Paxton in the death of his wife were dismissed because in the district attorney's view he had been cleared by a polygraph examination. Under our view of controlling Supreme Court authority, this exclusion denied Mr. Paxton his right to present mitigating evidence as a basis for a sentence less than death. Moreover, in view of the prosecutor's mendacious closing argument that Mr. Paxton had failed to refute the state's version of his wife's death, that the reason for the dismissal of charges against him was unknown, and implying that his daughter had not testified against him out of fear, Mr. Paxton was denied his due process right to explain or deny the evidence against him.

Paxton, 199 F.3d at 1215-16 (emphasis omitted). Further:

> [T]he misconduct which undisputedly occurred here was an integral part of the deprivation of Mr. Paxton's constitutional rights to present mitigating evidence, to rebut evidence and argument used against him, and to confront and cross-examine the state's witnesses. Because [the prosecutor]'s remarks infringed upon specific constitutional rights, Mr. Paxton may establish his

entitlement to habeas relief without showing that the comments rendered his sentencing fundamentally unfair.

> We further conclude that [the prosecutor's] comments had a substantial prejudicial effect on those rights by implying to the jury that Mr. Paxton had no evidence in mitigation, that the reason for the dismissal of the charges was suspect, and that his daughter was afraid to testify against him. These remarks cannot be characterized as an invited response, nor did the defense have any means for effectively rebutting them. See [Darden v. Wainwright, 477 U.S. 168, 182 (1986)]. We thus have no doubt that [the prosecutor's] conduct crossed the line between a hard blow and a foul one, consequently giving rise to a valid constitutional claim.

Id. at 1218 (footnote omitted).

Petitioner's case is significantly distinct from Paxton. Paxton involved the deprivation of a defendant's right to present mitigating evidence or challenge the prosecutor's misleading argument. As discussed supra, the Court has found no constitutional error in the exclusion of Davis's statements. In addition, the actions of the prosecutor in Petitioner's case do not rise to the level of a "foul blow" as described in Paxton. See also Berger v. United States, 295 U.S. 78, 88 (1935). Det. Stieber's testimony was not demonstrably false and the prosecutor's comment was proper in light of the testimony and evidence presented at trial. When all of the evidence is considered in the aggregate, Petitioner was not deprived of his right to a fundamentally fair trial. The OCCA's determination is neither unreasonable, nor contrary to, clearly established federal law. Petitioner's third claim for relief is denied.

### 3.      Ground 2:  Alternative Theories of First Degree Murder

In his second ground for relief, Petitioner argues his guilty verdict is constitutionally invalid because the jury was improperly instructed on one of the State's alternative theories

of first degree murder. (Pet. at 35-41.) The State pursued two theories of first degree murder: malice aforethought and felony murder. (O.R. at 373-74.) As to felony murder, the underlying alleged felony charged in the information and presented to the jury was Robbery by Force. Robbery by Force, however, is not an enumerated felony used to support a conviction for first-degree murder. 21 Okla. Stat. § 701.7(B) (Supp. 1998).[8] The trial court's felony murder jury instructions contained the elements of Robbery by Force and instructed the jury it could return a guilty verdict under either theory. (O.R. at 431-34.)

Under Oklahoma law, Robbery with a Dangerous Weapon is an enumerated felony supporting first degree felony murder. § 701.7(B). As explained in the OCCA opinion:

> The elements of Robbery with a Dangerous Weapon are:
>
> 1. wrongful
>
> 2. taking
>
> 3. carrying away

---

[8] The relevant statute reads:

> A person also commits the crime of murder in the first degree, regardless of malice, when that person or any other person takes the life of a human being during, or if the death of a human being results from, the commission or attempted commission of murder of another person, shooting or discharge of a firearm or crossbow with intent to kill, intentional discharge of a firearm or other deadly weapon into any dwelling or building as provided in Section 1289.17A of this title, forcible rape, robbery with a dangerous weapon, kidnapping, escape from lawful custody, eluding an officer, first degree burglary, first degree arson, unlawful distributing or dispensing of controlled dangerous substances, or trafficking in illegal drugs.

§ 701.7(B).

4. personal property

5. of another

6. from the person/(the immediate presence) of another

7. by force/fear

8. through use of a (dangerous weapon).

21 O.S. Supp. 1999, § 801, See OUJI-CR (2d) 4-144. The elements of Robbery by Force contain the first seven elements outlined above but not the eighth element. 21 O.S. 1991, § 791, See OUJI-CR (2d) 4-141. (First Degree Robbery requires that there be immediate force or fear of immediate force).

Primeaux, 2004 OK CR 16, ¶ 67, 88 P.3d at 906.

The OCCA reviewed Petitioner's claim, noted Petitioner failed to object to the instructions, and determined the improper instruction was plain error. Id., ¶¶ 71-76, 88 P.3d at 906-07. However, concluding the error was harmless, the OCCA denied relief. Id., ¶¶ 77-89, 88 P.3d at 907-09.

> a.   **The trial court's erroneous jury instruction is subject to harmless error analysis**

Petitioner first argues the failure to properly instruct the jury was structural error. (Pet. at 39.) Structural errors are "defect[s] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." Arizona v. Fulminante, 499 U.S. 279, 310 (1991). "Errors of this type are so intrinsically harmful as to require automatic reversal . . . without regard to their effect on the outcome." Neder v. United States, 527 U.S. 1, 7 (1999). However, few constitutional errors necessitate automatic reversal. See Fulminante, 499 U.S. at 306 ("[M]ost constitutional errors can be harmless."); Rose v. Clark,

478 U.S. 570, 578 (1986) ("[W]hile there are some errors to which <u>Chapman</u> does not apply,

they are the exception and not the rule.").  In <u>Johnson v. United States</u>, 520 U.S. 461, 468-69

(1997), the Supreme Court outlined the narrow scope of structural error:

> We have found structural errors only in a very limited class of cases:  <u>See</u> <u>Gideon v. Wainwright</u>, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (a total deprivation of the right to counsel); <u>Tumey v. Ohio</u>, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (lack of an impartial trial judge); <u>Vasquez v. Hillery</u>, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (unlawful exclusion of grand jurors of defendant's race); <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (the right to self-representation at trial); <u>Waller v. Georgia</u>, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (the right to a public trial); <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (erroneous reasonable-doubt instruction to jury).

Indeed, there is a strong presumption that a constitutional error is subject to harmless error

analysis "if the defendant had counsel and was tried by an impartial adjudicator."  <u>Rose v.</u>

<u>Clark</u>, 478 U.S. at 579.

Existing Supreme Court precedent confirms the appropriateness of the OCCA's

application of harmless error.  <u>Neder</u>, 527 U.S. at 9.  In <u>Neder</u>, the trial court failed to instruct

the jury on a necessary, but undisputed, element for some of the counts for which Neder was

convicted.  <u>Id.</u> at 6.  In concluding the error was not structural, the Supreme Court reasoned,

"[u]nlike such defects as the complete deprivation of counsel or trial before a biased judge,

an instruction that omits an element of the offense does not necessarily render a criminal trial

fundamentally unfair or an unreliable vehicle for determining guilt or innocence."  <u>Id.</u> at 9

(emphasis omitted).  The OCCA discussed <u>Neder</u> and applied harmless error:

The United States Supreme Court has recently decided a case where an instruction was given which omitted an element of the offense. In Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999), the Court held that an instruction that omits an element of an offense may be subject to the harmless error doctrine. Neder is a federal mail fraud, wire fraud, bank fraud and filing false tax returns case. One of the elements in each count is that false statements must be material. However, the trial court instructed the jury not to consider the materiality of any false statements.

The inquiry is whether it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. Neder, 527 U.S. at 15, 18, 119 S.Ct. at 1836-38.

The Court started from the premise that "most constitutional errors can be harmless." Id. 527 U.S. at 9, 119 S.Ct. at 1833, quoting Arizona v. Fulminante, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." Id., quoting Rose v. Clark, 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

The Supreme Court had decided an earlier case where the trial court made the determination of materiality in a perjury prosecution. Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). In that case, the Court determined that, absent an objection at trial, they would review for plain error only. The Court determined that "the error did not warrant correction in light of the 'overwhelming and uncontroverted' evidence supporting materiality." Johnson, 520 U.S. at 470, 117 S.Ct. at 1544. See Neder, 527 U.S. at 9, 119 S.Ct at 1833-34.

The Court concluded that the Johnson decision countered "the argument that the omission of an element will always render a trial unfair." Neder, 119 S.Ct. at 1834. The Court found that:

> Neder was tried before an impartial judge, under the correct standard of proof and with the assistance of counsel; a fairly selected, impartial jury was instructed to consider all of the evidence and argument in respect to Neder's defense against the tax charges. Of course, the court erroneously failed to charge the jury on the element of materiality, but that error did not

render Neder's trial "fundamentally unfair," as that term is used in our cases.

Id. The Supreme Court stated that "[t]he evidence supporting materiality was so overwhelming, in fact, that Neder did not argue to the jury-and does not argue here-that his false statements of income could be found immaterial." Id. 119 S.Ct. at 1837.

Neder argued that "to rely on overwhelming record evidence of guilt that the jury did not actually consider, he contends would be to dispense with trial by jury and allow judges to direct a guilty verdict on an element of the offense." Id. at 1837-38.

The test was set forth in this manner:

Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?  To set a barrier so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place: 'Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.'  R. Traynor, The Riddle of Harmless Error 50 (1970)[.]

Id. at 1838.

The jury in the present case had sufficient evidence to conclude that [Petitioner] committed the crime of malice murder or felony murder and the underlying crime of robbery with a dangerous weapon.  The missing element of "with the use of a knife" was not contested in this case, and there was overwhelming evidence that a knife was used in this crime. [Petitioner], although he testified that he did not do it, testified that he saw the person stabbing Julia Bear with a knife.

Because the evidence of the use of a knife was overwhelming and uncontested, we find that the failure to include, in the instructions, the element of "with the use of a knife" was harmless beyond a reasonable doubt.  The fact that alternative theories were charged, and the jury was not required to indicate the theory upon which it based its decision does not change our decision.  The evidence in this case supported both theories beyond a reasonable doubt.

Primeaux, 2004 OK CR 16, ¶¶ 81-89, 88 P.3d at 908-09.

Petitioner proffers reasons why <u>Neder</u> is inapplicable to his case.[9] (Pet. at 37.) First, it is true that <u>Neder</u> was not a capital case, but that alone does not make <u>Neder</u>'s holding irrelevant. <u>See</u> <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16-17 (2003) ("We cannot say that because the [erroneous jury instruction] occurred in the context of a capital sentencing proceeding that our precedent requires [a different] result."). Petitioner also argues the defendant in <u>Neder</u> did not contest the omitted element of the crime, and that <u>Neder</u> did not involve alternative theories of prosecution. The Tenth Circuit's recent decision in <u>United States v. Holly</u>, 488 F.3d 1298 (2007), rebuts Petitioner's arguments.

In <u>Holly</u>, the defendant was convicted of fourteen criminal counts, of which five involved aggravated sexual abuse. <u>Id.</u> at 1299. The trial court's instruction explained that the jury could find aggravated sexual abuse under two theories, either force or fear. <u>Id.</u> at 1301. On appeal, the Tenth Circuit concluded the fear instruction was erroneous. It then addressed the applicability of harmless error, given two independent bases for conviction, one proper and one erroneous. <u>Id.</u> at 1304. Before applying harmless error to the defendant's convictions, the Tenth Circuit reconciled <u>Neder</u> with the earlier case of

---

[9] Petitioner also submits arguments that parallel the dissenting opinions in <u>Neder</u>. (Pet. at 36-37, 40-41) (arguing a criminal defendant is entitled to a jury determination of guilt beyond a reasonable doubt on every element of an offense and the jury trial right is "the spinal column of American democracy") (<u>quoting</u> <u>Neder</u>, 527 U.S. at 30 (Scalia, J., dissenting)). Supreme Court dissenting opinions, no matter how persuasive, are not "'clearly established Federal law as determined by the Supreme Court.'" <u>Williams</u>, 529 U.S. at 412. Clearly established federal law, as determined by the Supreme Court "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Id.</u>

Stromberg v. California, 283 U.S. 359 (1931).  Holly, 488 F.3d at 1305-07.  The Court in Stromberg reversed a conviction without conducting a harmless error analysis when it was impossible to determine whether the verdict relied on an unconstitutional ground or a constitutional ground.  Id. at 369-70.  Holly held that harmless error is inappropriate in the case of "a theory of conviction which 'could not constitute a lawful foundation for a criminal prosecution,'" but that mere instructional error is subject to harmless error.  Holly, 488 F.3d at 1305-06 (quoting Stomberg, 283 U.S. at 368).

As in Holly, Petitioner's convictions are founded upon two prosecutorial theories, both of which were not legally insufficient or invalid.  The error in Petitioner's case was not that the trial court provided an instruction on a legally infirm theory, but rather the trial court failed to give the proper instruction to an underlying felony supporting capital murder.  Petitioner attempts to cast the instructional error as the "substit[ion] in a wholesale manner [of] an additional element of an uncharged crime as if the jury actually considered that additional element."  (Pet. at 38) (emphasis omitted).  However, the functional difference between the proper instruction (Robbery with a Deadly Weapon) and the actual instruction given (Robbery by Force) was the omission of a single element–use of a deadly weapon.  As Neder, and the subsequent case of Holly makes clear, jury instructions that omit an element are not per se reversible error.  Instead, and as the OCCA concluded, the instructional error is subject to harmless error review.

Petitioner argues because he contested the existence of the omitted element, "use of a knife," and because Neder involved an undisputed element, Neder is inapplicable.  The

36

Court disagrees for two reasons.  First, it is not entirely clear that an uncontested element is a requisite to application of harmless error to an omitted jury instruction.  See Holly, 488 F.3d at 1309-11 (applying harmless error review to an omitted but disputed element).  Whether an element is uncontested may be an appropriate consideration in the actual application of harmless error.  Secondly, the OCCA determined that Petitioner did not contest the missing element of "with the use of a knife."  Primeaux, 2004 OK CR 16, ¶ 88, 88 P.3d at 909.  A review of the trial record confirms this conclusion.  Petitioner denied his own use of the knife, but testified that a knife was used in the murders.  (Tr., Vol. 6, pp. 223-25.)  Petitioner does not dispute, and it is overwhelmingly clear from the record, that the murders were committed with a knife – a deadly weapon.[10]

In sum, the OCCA's application of harmless error analysis to the trial court's erroneous jury instructions is not contrary to clearly established federal law.  Williams, 529 U.S. at 405.  Neder's harmless error standard controls the error in Petitioner's case.

---

[10] To the extent Petitioner argues the jury convicted him on an uncharged crime, the Court notes the OCCA determined that the Information was sufficient to provide Petitioner with notice of the charges against him apprised him of what he must defend against at trial.  As the OCCA reasoned, "In closely looking at the Information, it is clear that while it states Robbery by Force, the language contains all the elements of Robbery with a Dangerous Weapon."  Primeaux, 2004 OK CR 16, ¶ 68, 88 P.3d at 906.  The OCCA determined the Information was sufficient because (1) it was clear from the beginning of the case that the State intended to charge Petitioner with first-degree murder; and (2) the Information recited the first-degree murder statute, which clearly indicates that the underlying felony must be Robbery with a Dangerous Weapon.  Id. ¶¶ 69-70, 88 P.3d at 906.  The Court concludes that this determination was not contrary to, nor an unreasonable application of federal law.

### b.       The OCCA application of harmless error analysis was reasonable

On federal habeas review, the Court applies the standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), to constitutional error.  See Fry v. Pliler, 551 U.S. 112, 121 (2007) (Brecht standard applies uniformly in all federal habeas corpus cases under § 2254, whether or not a state court has applied the Chapman standard); Welch v. Workman, 607 F.3d 674, 685 (10th Cir. 2010)).  The harmless error standard under Brecht is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (citation omitted).  If "grave doubt" exists about the harmlessness of the error, the Court must treat the error as though it had affected the verdict. See O'Neal v. McAninch, 513 U.S. 432, 435 (1995).   "Grave doubt" exists where the issue of harmlessness is "'so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error.'"  Bland v. Sirmons, 459 F.3d 999, 1009-10 (10th Cir. 2006) (quoting O'Neal, 513 U.S. at 435) (alteration in original).

Petitioner offers two reasons why the error was not harmless.  First, he points out that the prosecutor told the jury that it did not have to agree on a theory of guilt and it could convict on either a robbery theory or a theory of malice murder.  (Pet. at 40.)  This is true, but also inconsequential, because both theories were legally valid.  As discussed supra, the error was in the actual instruction, not the underlying legal theory of prosecution.  See Holly, 488 F.3d at 1305-07.

Secondly, Petitioner argues the length of the jury deliberations and the jury's notes to the judge indicate that the jury was not overwhelmingly convinced of Petitioner's guilt. (Pet. at 40.) The jury deliberated for approximately eight hours over two days. (Tr., Vol. 7A, pp. 66, 76-79; Tr., Vol. 8, pp. 3); Primeaux, 2004 OK CR 16, ¶ 8, 88 P.3d at 915 (Chapel, J., dissenting). During deliberations, the jury sent multiple requests via two separate notes to the judge.[11] In other contexts, prolonged jury deliberations are relevant in a harmless error analysis. See United States v. Soussi, 316 F.3d 1095, 1106 n.6 (10th Cir. 2002) ("[T]he length of time the jury deliberates may sometimes be a factor in determining whether an error is harmless[.]"); United States v. Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001) ("Longer jury deliberations 'weigh against a finding of harmless error [because l]engthy deliberations suggest a difficult case.'" (quoting United States v. Varoudakis, 233 F.3d 113, 126 (1st Cir.2000))). However, the Court cannot conclude that the jury deliberations and inquiries were unusually protracted, given the duration of the trial, which lasted four days and included twenty-five witnesses.

---

[11] The first note read, "Can we get the original manuscript of Detective Stieber's interview of Bruce Primeaux (or the video of the interview?) We would like testimony [of] Det./Off. Stieber[,] Billie Roberson[,] Pam Jones[,] Sean Fierres [sic][,] & VCR & TV to review tape." (O.R. at 436.) The trial judge responded, "I regret that I am unable to comply with your requests other than providing the VCR/TV." (Id.)

The second note requested "Will the testimony of the witnesses be available tomorrow? We would like to review the testimony of the following witnesses if their transcripts will ever be available: (since it is considered evidence): Shawn Fierris[,] Billie Jean Roberson[,] Pam Jones[,] Detective Stieber. If not, could we have them read back to us. Please advise. Thank you!" (O.R. at 437.) The trial judge responded, "This Court simply does not have the technology to provide transcripts of the testimony of witnesses nor is the court reporter authorized to read portions of the trial transcript to the jury. Please continue your deliberations using your notes and collective memory." (Id.)

In light of the evidence presented at trial, especially the evidence supporting the use of a knife in the commission of the murders, the Court finds that the failure to instruct the jury on the element of "use of a weapon" did not have a substantial or injurious effect or influence on the jury. Any error in the felony murder instruction was harmless. Petitioner's second claim for relief is denied.

### 4. Ground 4: Exclusion of Juror for Cause

Petitioner argues in his fourth ground for relief that the trial court improperly excused prospective juror Ms. Reeves for cause, thereby violating his Sixth and Fourteenth Amendment rights to a trial before an impartial jury. (Pet. at 50-54.) Petitioner characterizes Ms. Reeves's responses during voir dire as generalized concerns or objections to serving on a capital jury. (Pet. at 54; Reply at 17.) According to Petitioner, the trial court never established that Ms. Reeves's reservations about the death penalty substantially impaired her ability to serve. (Pet. at 54.) The OCCA denied Petitioner's claim on the merits in its decision on direct appeal. Primeaux, 2004 OK CR 16, ¶¶ 21-30, 88 P.3d at 900-01. It concluded:

> [N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

> Allen v. State, 1994 OK CR 13, ¶ 23, 871 P.2d 79, 90-91, cert. denied, 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994) (citations omitted). Reeves stated that she would have a hard time considering the death penalty and finally stated that her feeling would prevent her from considering the death

penalty. She never stated clearly that she would set aside her feelings and consider all three punishment options.

We find that the manner in which the trial court conducted voir dire in this case complied with the law. Matthews v. State, 2002 OK CR 16, ¶ 16, 45 P.3d 907, 915, cert. denied, 537 U.S. 1074, 123 S.Ct. 665, 154 L.Ed.2d 570 (2002); Abshier v. State, 2001 OK CR 13, ¶¶ 113-14, 28 P.3d 579, 603-04, cert. denied, 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002). The trial court was in the best position to determine Reeves' fitness for jury duty in this case by viewing Reeves' demeanor during questioning. See Patton v. State, 1998 OK CR 66, ¶ 16, 973 P.2d 270, 281-82, cert. denied, 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999). Based on the entire voir dire of this juror, we cannot say that the trial court abused its discretion in removing potential juror Reeves for cause.

Id. ¶¶ 29-30, 88 P.3d at 901.

The Sixth and Fourteenth Amendments prohibit the exclusion of jurors from a capital trial "simply because they voice[] general objections to the death penalty or express[] conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 522 (1968). A dismissal of a juror contrary to Witherspoon is a constitutional error requiring vacation of a death sentence. Rivera v. Illinois, ___ U.S. ___, 129 S.Ct. 1446, 1455 (2009). A juror may be dismissed for cause if his "'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 420 (1985) (citation and emphasis omitted). A trial court's determination of a juror's ability to obey instructions and fulfill his duties is subject to deference: "[W]hen there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly is by its assessment of the venireman's demeanor, is entitled to resolve it in favor of the State.'" Uttecht v. Brown, 551 U.S. 1, 7 (2007)

(alterations omitted) (quoting Wainwright v. Witt, 469 U.S. at 434) . In addition, a trial judge's decision on juror bias is a factual determination subject to the presumption of correctness in 28 U.S.C. § 2254(e)(1). Witt, 469 U.S. at 429; see also Cannon v. Gibson, 259 F.3d 1253, 1280 (10th Cir. 2001).

A review of the record demonstrates that the OCCA's decision is not contrary to, nor an unreasonable application of, clearly established federal law. The Court presents the voir dire of Ms. Reeves to provide context to the trial court's decision:

> THE COURT: If you serve as a juror in this case and you find that the Defendant has – is guilty of Murder in the First Degree beyond a reasonable doubt, and further you find that the State has proven one or more of those statutory grounds authorizing the imposition of the death penalty beyond a reasonable doubt, could you consider all three of the available punishments and impose that one punishment that you believe is warranted by the law and the evidence in this case?
>
> MS. REEVES: No, sir.
>
> . . . .
>
> THE COURT: Which of those punishments could you not consider?
>
> MS. REEVES: Death.
>
> . . . .
>
> THE COURT: Are you saying that there are no facts or circumstances that you can conceive of where the imposition of the death penalty would be an appropriate punishment?
>
> MS. REEVES: I just – that bothers me.
>
> THE COURT: I understand. And certainly, no one is suggesting that the concept should not bother someone. And I assume that any juror that

serves in this case would have a significant difficulty in ever levying such a punishment.

But what the Court – what the law requires is that once you have heard all of the facts and circumstances in this case, and you haven't heard those yet, but that once you have heard all of the facts and circumstances in this case, and if the jury has already found the Defendant guilty of the charge of Murder in the First Degree beyond a reasonable doubt, and further found that one or more of the statutory grounds which authorized the death penalty has been proven beyond a reasonable doubt, that you could seriously consider all three of the punishments and – and impose that one sentence that you believe is warranted under the facts and circumstances of this case.

Now, do you believe that even though you have some reluctance or – toward the death penalty that if you served as a juror in this case you could set that feeling aside and at least seriously consider the death penalty under the facts and circumstances once you know them?

MS. REEVES:        I am not sure I could.

(Tr., Vol. 3, pp. 3-5.)  At that point, the trial court continued voir dire in chambers outside

the presence of the jury to give defense counsel an opportunity to rehabilitate the juror.  (Id.

at 5.)

THE COURT:        . . . Ms. Reeves, in the courtroom, you have indicated that you have some opposition or reluctance to the death penalty.  I need to ask you a few more questions about that to make sure I understand your – your beliefs.

First, do you believe that your opposition to the death penalty, and knowing that it is an available punishment for the Defendant if he were convicted of Murder in the First Degree, and the other – and the State proves one or more of the statutory grounds which authorizes its imposition, do you think your belief would prevent or substantially impair you with finding the Defendant guilty if the law – in the first stage; do you think you would have any – that might prevent you from finding him guilty because of your belief against the death penalty?

Do you understand what I am asking?

43

MS. REEVES:	Yes.

THE COURT:	Okay.

MS. REEVES:	I – I am afraid I – that would be on my mind for a long time and I don't know if I could.

THE COURT:	If – if this case were to reach the penalty stage, if the State proved that the Defendant committed Murder in the First Degree beyond a reasonable doubt, and the State introduced evidence to support the finding that the – that one or more of the statutory grounds had been proved beyond a reasonable doubt, and it reached the penalty phase, would you automatically vote against the death penalty?

MS. REEVES:	It's hard – I am afraid it would be very hard for me to make that decision.

THE COURT:	Don't get me wrong.  I really do understand your response.  The – as I tried to indicate in the courtroom, it would not be particularly unusual for a juror for it to be hard for them to impose the death penalty.  That's different from someone who says I simply cannot consider that; that if I am part of the jury that's going to consider a penalty in this case and the death penalty is an option, I can't consider that.  And if it's – and if that's your position that you just can't consider it, then that's – you would not be an appropriate juror in this case.

On the other hand, if you're saying, well, I could seriously consider it, but it would be very hard for me to impose it, that's different.  That doesn't – then, you would not be automatically excused.  You – you still may have the right to serve if you can seriously consider imposing it.

One of the ways that I generally ask people to think about that is, is to think, is there, under any facts, no matter how heinous the crime was, or how many people were killed, or whatever gruesome facts you want to think of, [are] there any circumstances under which you would believe that the death penalty would be an appropriate punishment for someone convicted of that murder.

MS. REEVES:	I don't know.  I think I would still have a problem with it.

THE COURT:        So, are you saying that you can't think of a circumstance where you would think it would be an appropriate punishment?

MS. REEVES:        I don't know.  I would hope I would never have to make that decision.

(Id. at 6-8.)

The trial court permitted Petitioner's trial counsel the opportunity to rehabilitate Ms.

Reeves.

[PETITIONER'S TRIAL COUNSEL]:    My question to you is, are there any circumstances in your mind where you would consider the death penalty to be an appropriate punishment?

MS. REEVES:        I am not sure.

[PETITIONER'S TRIAL COUNSEL]:    Okay.

MS. REEVES:        I just don't feel comfortable.

. . . .

[PETITIONER'S TRIAL COUNSEL]:    Okay.  So, you really don't – it's not – this is not a part of your belief system then that you have – you have strong beliefs against the death penalty as a – as a general thing; this is just, as far as this goes, you don't really want to be put in the position of having to make a decision like that?

MS. REEVES:        Right.

. . . .

THE COURT:        You have indicated, if I understand your answer to [Petitioner's Trial Counsel's earlier] question, that your opposition to the death penalty is not one that is based on a personal belief that the death penalty is inherently wrong; is that correct?

MS. REEVES:        No, I don't think it's wrong.

> THE COURT:        And you have indicated to [Petitioner's Trial Counsel] that your reluctance in this case is that you don't want to be the person or one of the twelve people that makes that decision on whether the death penalty is imposed.  Would that be fair to say; is that your – does that summarize your position and, if it doesn't, be sure and tell me what – what you

> . . . .

> MS. REEVES:        I think so.  I just don't feel comfortable doing it.

> THE COURT:        That – the point that you don't feel comfortable considering – you don't feel comfortable doing that or being part of that jury, I understand.

> The question I have to you is, if you serve on the jury and if you – the jury reaches that point where it must consider all three of the punishments, do you think your views on this subject will prevent you or substantially impair you from considering the death penalty?

> MS. REEVES:        Yes.

> THE COURT:        And that's regardless of what the facts are surrounding this particular murder?

> MS. REEVES:        (no audible response)

> THE COURT:        That you still believe – I mean, my question to you is, will your views prevent you or substantially impair you from considering the death penalty as one possible punishment regardless of what the facts and circumstances are in this particular case?

> MS. REEVES:        I think so.

> THE COURT:        Okay.

> MS. REEVES:        It just makes me very uncomfortable to have to make that decision.

(Id. at 9-12.)  The trial court then excused Ms. Reeves.  After Petitioner's trial counsel

objected to the excusal of Ms. Reeves, the trial court stated, "And I understand.  I – I just

couldn't get her to say that [her concerns] wouldn't impair her or prevent her from considering it."  (Id. at 12.)

As is evident from a review of the voir dire, Ms. Reeves continuously questioned her own ability to set aside her concerns about the death penalty and properly consider all available punishments.  At no point did she indicate that she would be able to disregard her personal bias and obey an oath as a juror to follow the law as instructed.  Her responses evidenced more than a "generalized concern" about capital punishment.  Indeed, Ms. Reeves indicated her views on the death penalty would prevent or substantially impair her from considering the death penalty.

Moreover, the Court recognizes the trial court's thoughtful and deliberate questioning in its attempt to determine whether Ms. Reeves's bias required excusal.  The trial court was well within its province when it excused Ms. Reeves for cause because her views on serving on a capital jury would prevent or substantially impair the performance of her duties as a juror.  See Witt, 469 U.S. at 420.  Given the substantial deference given to a trial court's excusal of prospective jurors for their inability to obey instructions and fulfill their duties based on juror bias and this Court's standard of review under the AEDPA of the OCCA's determination, Petitioner's claim fails.  See 28 U.S.C. § 2254(d); Brown, 551 U.S. at 7. Petitioner's fourth ground for relief is denied.

**5.     Ground 5:  Admission of Billy Roberson's Preliminary Hearing Testimony**

In his fifth ground for relief, Petitioner argues he was denied his confrontation rights under the Sixth and Fourteenth Amendments when the trial court admitted the preliminary hearing testimony of Billy Roberson.  (Pet. at 55-61.)  During Petitioner's trial, when the State was unable to produce Mr. Roberson for live testimony, it sought to admit his preliminary hearing testimony.  After a hearing, the trial court admitted Mr. Roberson's testimony, including Petitioner's cross-examination, which was read to the jury and into the record during trial.  (Tr., Vol. 5, pp. 189-91; Court's Exhibit 1.)

Petitioner argues the admission of Mr. Roberson's preliminary hearing testimony violated his confrontation rights pursuant to Barber v. Page, 390 U.S. 719 (1968).  In Barber, the Supreme Court held that a witness is not unavailable for purposes of the Confrontation Clause of the Sixth Amendment unless the State makes a good faith effort to secure the presence of the witness.  Id. at 724-25.  Petitioner contends the State failed to introduce sufficient evidence of good faith efforts and due diligence to secure the appearance of Mr. Roberson, and that his preliminary hearing testimony does not bear sufficient indicia of reliability to permit its admission.  (Pet. at 59.)

At the outset, the Court notes that Petitioner's argument relating to the reliability of Mr. Roberson's preliminary hearing testimony is irrelevant under the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004).  See id. at 68-69  (abandoning the

"adequate indicia of reliability test" from <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980)).[12] The appropriate inquiry under <u>Crawford</u> is, "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." <u>Id.</u> at 68. Petitioner challenges both: (1) the state court determination that Mr. Roberson was unavailable despite good faith efforts and due diligence and (2) his ability to cross-examine Mr. Roberson during the preliminary hearing. The Court reviews the claim under 28 U.S.C. 2254(d)(1).[13]

The OCCA's opinion held in relevant part:

> The record clearly indicates that Roberson was absent from trial. [Petitioner] attacks the State's "due diligence" in seeking his attendance. Roberson was charged as an accessory to this murder and he had a deal that required him to testify. The prosecutor's office last met with Roberson prior to a trial date in August 2001. (This trial started on February 7, 2002). Roberson had appeared at all of his required court dates, bond hearings and meetings.
>
> Three weeks prior to this trial, the prosecutor's office contacted Roberson's attorney, but the attorney could not contact Roberson. A subpoena was issued for Roberson, but the members of the sheriff's office could not locate Roberson to serve the subpoena. Roberson had a meeting with the prosecutor scheduled three weeks prior to trial, but Roberson did not appear.

---

[12] The Supreme Court's decision in <u>Crawford</u> announced a "new rule," <u>see</u> <u>Whorton v. Bockting</u>, 549 U.S. 406, 416 (2007), and it applies to Petitioner's case because it was decided on March 8, 2004, before Petitioner's direct appeal was final on April 6, 2004. <u>See id.</u>, 549 U.S. at 416 ("[A] new rule is generally applicable only to cases that are still on direct review.").

[13] Respondent argues the OCCA determination that Mr. Roberson was unavailable is subject to the presumption of correctness under 28 U.S.C. § 2254(e)(1) and Petitioner has not produced any clear evidence to the contrary. (Resp. at 24-26.) However, whether the State puts forth a good faith effort to produce a witness is a mixed question of fact and law subject to the "'unreasonable application of clearly established Federal law standard.'" <u>Cook v. McKune</u>, 323 F.3d 825, 831 (10th Cir. 2003).

A detective with the Ponca City police department tried to locate Roberson by contacting Roberson's family members and people he knew that might have knowledge of his whereabouts. Investigators went to Tulsa and contacted several people with whom he had reportedly been living.

On January 29th, a material witness warrant was issued for Roberson. Roberson could not be located before trial. Based on the facts presented to the trial court, the court did not abuse its discretion in ruling that Roberson was unavailable.

[Petitioner] claims, because Roberson was the only person to testify that he threw a knife into the lake after the murder, that his preliminary hearing testimony does not bear a "sufficient indicia of reliability to afford the trier of fact a satisfactory basis for evaluating the truth of the prior testimony."

The United States Supreme Court has held that, under similar circumstances, when a defendant is provided an opportunity to cross examine the witness and avails himself of that opportunity at a prior hearing, the confrontation clause is satisfied and a transcript of the prior hearing is admissible. Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). We have held that this procedure is proper. See Howell v. State, 1994 OK CR 62, ¶ 18, 882 P.2d 1086, 1091, cert. denied, 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995).

Roberson's "testimony was given under circumstances which closely approximated those of a typical trial. His testimony was made under oath and in a truth-inducing courtroom atmosphere." Bernay v. State, 1999 OK CR 37, ¶ 17, 989 P.2d 998, 1007, cert. denied, 531 U.S. 834, 121 S.Ct. 92, 148 L.Ed.2d 52 (2000). The trial court did not abuse its discretion in allowing the preliminary hearing testimony of Roberson to be read during the trial.

Primeaux, 2004 OK CR 16, ¶¶ 59-65 88 P.3d at 905-06.

### a.    State Court Proceedings

Mr. Roberson was initially charged as an accessory after the fact in connection with the murders of Littlecook and Bear. (Tr., Vol. 4, p. 246.) He waived his Fifth Amendment

privilege against self-incrimination prior to Petitioner's preliminary hearing, during which he gave the following testimony. (Prelim., Vol. 1, pp. 89-119.)

Mr. Roberson is the stepson of Petitioner. (Id. at 90.) On the day of the murders, Mr. Roberson arrived at Petitioner's home with Shawn Fiarris in the afternoon. (Id. at 92.) After drinking beer with Petitioner for some time, Petitioner told Mr. Roberson that earlier he "had gotten into a fight and tore some people up pretty good." (Id. at 96.) Petitioner told Mr. Roberson that he needed to get rid of a black plastic bag containing clothes. Petitioner and Mr. Roberson decided to burn the clothing. (Id. at 100-01.) Mr. Roberson left Petitioner's home with Petitioner and his wife, Mr. Roberson's son, and Fiarris. (Id. at 98.) The group first traveled to a gas station to buy fuel and beer and then visited a different gas station to purchase cigarettes and a small container of gasoline to burn the clothing. (Id. at 101-02.) Afterwards, they drove to a local lake and proceeded to burn the clothing in a fire pit at a campsite. (Id. at 105-06.) Mr. Roberson said that Petitioner had a little pocketknife and he wanted to get rid of it. Petitioner considered burning the knife, but Mr. Roberson told him that putting the knife in the fire would not dispose of it. Petitioner gave Mr. Roberson the knife and Mr. Roberson threw the knife into the lake. (Id. at 108-09.)

The State first advised the trial court on the second day of voir dire that it was having difficulty locating Mr. Roberson. (Tr., Vol. 2, pp. 25-26.) Later during the trial, the trial court held a hearing on the State's motion to admit the preliminary hearing testimony of Mr. Roberson pursuant to 12 Okla. Stat. § 2804 (1978). (Tr., Vol. 4, pp. 244-81.) In support of its motion, the State offered three witnesses who testified as to the efforts the State made to

secure the presence of Mr. Roberson.  (Id. at 245-73.)  Assistant District Attorney Brian Stuber testified Mr. Roberson had a plea bargain in which the State would recommend a sentence not to exceed six months in exchange for his cooperation and truthful testimony in the prosecution of Petitioner.  Stuber testified that Mr. Roberson had been very cooperative up until a few weeks before trial.  (Id. at 246-47.)  After Mr. Roberson missed a pre-trial interview two weeks prior to trial, Stuber requested a material witness bond.  (Id. at 248.)

Det. Stieber testified that he had frequent contact with Mr. Roberson prior to Petitioner's trial and that up until two weeks before trial, he had no reason to believe Mr. Roberson would be uncooperative or unavailable.  In an effort to locate him, Det. Stieber contacted Mr. Roberson's mother, his sister in Tulsa, his girlfriend's mother, and individuals in Ponca City that might have contact with him.  (Id. at 257-59.)  Det. Stieber testified that he requested and received a statewide notification to all law enforcement agencies requesting assistance in locating Mr. Roberson.  Det. Stieber followed up on all possible leads without success.  (Id. at 263-64.)

The State also offered the testimony of Kyle Hartwig, an investigator for the District Attorney's office.  Hartwig testified he assisted in the efforts to locate Mr. Roberson in the weeks leading to trial.  He checked through various law enforcement resources including driving records, police contacts, warning tickets and citations, and other law enforcement agencies.  He also reviewed employment records and Department of Human Services databases.  Hartwig followed up on leads, including friends of Mr. Roberson, to no avail.

Hartwig made photographs of Mr. Roberson available to all shifts within the Ponca City Police Department.  (Id. at 267-71).

### b.  Arguments on Habeas

In support of his argument that admission of Mr. Roberson's preliminary hearing testimony violated his constitutional rights, Petitioner highlights the time period during which the State had no contact with Mr. Roberson and suggests that the State was slow to respond when it learned that Mr. Roberson might not appear.  (Pet. at 59-60.)  Petitioner cites to Cook v. McKune, 323 F.3d 825 (10th Cir. 2003), to buttress his argument.[14]  In Cook, the Tenth Circuit held that the state court determination that the State made good faith efforts and due diligence in attempting to secure the presence of a witness was an unreasonable application of clearly established federal law.  Id. at 840.  The Tenth Circuit applied a "reasonableness test" which involves the application of four criteria:

> First, the more crucial the witness, the greater the effort required to secure his attendance.  Second, the more serious the crime for which the defendant is being tried, the greater the effort the government should put forth to produce the witness at trial.  Third, where a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation, the defendant's interest in confronting the witness is stronger.  Fourth, a good measure of reasonableness is to require the State to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available.

---

[14] Even though Cook relied upon Ohio v. Roberts for its holding on unavailability, Crawford does not affect the unavailability analysis.  Therefore, Cook remains good law on the unavailability requirement.  See United States v. Tirado-Tirado, 563 F.3d 117, 123 n.3 (5th Cir. 2009) ("Crawford did not change the definition of 'unavailability' for Confrontation Clause purposes; pre-Crawford cases on this point remain good law.").

Id. at 835-36 (internal citations omitted). In particular, the Tenth Circuit highlighted the disparity between the significant efforts the State initially made to secure the witness for the preliminary hearing, and the subsequent passive attempts made to bring the witness in for trial. Id. at 836-37 (noting that the State was able to locate witness when he was hitchhiking throughout the Southwest, but failed to make similar efforts before trial). "If the State's feeble exertions in this case can be called a good-faith effort to secure [the witness] for trial, the Sixth Amendment protections . . . would be toothless." Id. at 840. See also Barber, 390 U.S. at 724-25 (holding State's failure to attempt to seek witness's presence was a violation of defendant's confrontation rights); but see Martinez v. Sullivan, 881 F.2d 921, 924-27 (10th Cir. 1989) (holding the state court's determination that the State exercised due diligence and made good faith efforts to secure witness was reasonable in light of the State's actions including serving witness with subpoena, purchasing an airplane ticket, telephoning witness, and notifying local authorities when learning of witness's failure to appear).

A review of the record confirms that the state court determination that Mr. Roberson was unavailable despite due diligence and good faith efforts on the part of the State is reasonable. The State offered evidence that Mr. Roberson was a cooperative witness whose behavior did not suggest he would fail to appear to testify. Once the State became aware of Mr. Roberson's possible unavailability, it secured a material witness warrant, notified all law enforcement agencies in the state, contacted known associates and relatives, searched databases, and followed up on possible leads. Petitioner fails to demonstrate that the OCCA's determination the State made good faith efforts and Mr. Roberson was unavailable

despite due diligence was contrary to, or an unreasonable application of, clearly established federal law.

Petitioner additionally argues his right to confrontation was not sufficiently preserved through the cross-examination of Mr. Roberson at the preliminary hearing. (Pet. at 60-61.) Petitioner appears to argue he did not have a meaningful opportunity to confront Mr. Roberson at the preliminary hearing because, at that time, the State's theory of the case was that Petitioner *and* Davis committed the murders. Petitioner contends that because the State later dropped the charges against Davis – who had already admitted to having a knife – Mr. Roberson's testimony about the pocketknife thrown into the lake later became critical to his case. (Pet. at 60-61.) Petitioner fails to cite to any clearly established federal law that supports a constitutional violation in the admission of prior testimonial statements subjected to cross-examination when the State presents a different theory of the case at trial. It is sufficient to note that Petitioner did, in fact, cross-examine Mr. Roberson at the preliminary hearing, and specifically cross-examined Mr. Roberson about the knife. (Prelim., Vol. 2, pp. 2-11.)

The OCCA's determination that Mr. Roberson was unavailable despite good faith efforts and due diligence on the part of the State was not unreasonable. Additionally, because Mr. Roberson's testimonial statements were earlier subjected to cross-examination, the OCCA's determination was reasonable. Petitioner's fifth claim for relief is denied.

### 6. Ground 6: Second State Prosecutorial Argument and Mitigation Jury Instructions

Petitioner argues the second stage jury instructions, combined with the prosecutor's closing argument, improperly limited the scope of the mitigating evidence the jury considered in violation of his Eighth and Fourteenth Amendments. (Pet. at 62-66.) Specifically, Petitioner complains of the following instruction:

### JURY'S DETERMINATION OF MITIGATING CIRCUMSTANCES

Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

(O.R. at 455.)

According to Petitioner, the first sentence of the instruction incorrectly restricts the mitigating evidence to the moral culpability of the accused in the context of the crime for which he was convicted. Petitioner also asserts the prosecutor's comments during closing argument caused the jury to reject Petitioner's proffered mitigating evidence that did not fit the definition from the jury instruction. (Pet. 63-65.) On direct appeal, the OCCA reviewed Petitioner's claim for plain error and denied relief on the merits:

[Petitioner] argues . . . that the prosecutor's argument based on the uniform jury instructions defining mitigating evidence violated his constitutional rights. Initially, we note that [Petitioner] has waived all but review for plain error on this issue because he failed to object to the argument of the prosecutor. See Simpson, 1994 OK CR 40, ¶ 10, 876 P.2d at 694.

The prosecutor asked to jury to review instruction number 11, which states in part "mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame."

The prosecutor told the jury that none of the mitigating evidence "extenuate what he did, that to the slightest degree reduce his moral culpability or his blame." During the second closing, the prosecutor stated, "I simply suggest to you that that in no way mitigates what he has done and what justice calls for in this case."

The quoted portion of the instruction, OUJI CR-2d 4-78, has been upheld by this Court. Williams v. State, 2001 OK CR 9, ¶¶ 108-09, 22 P.3d 702-727, cert. denied, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002).

In Frederick v. State, 2001 OK CR 34, ¶ 162, 37 P.3d 908, 949, this Court held that "the prosecutor is entitled to argue that the mitigation factors did not 'in any way [reduce Appellant's] moral culpability or blame.'" In Frederick, we held that the comment did not rise to the level of plain error.

[Petitioner] argues that the instruction, combined with the argument narrows the United States Supreme Court's definition of mitigating evidence: any evidence that a sentencing body could reasonably find warrants a sentence less than death. Citing, McKoy v. North Carolina, 494 U.S. 433, 441, 110 S.Ct. 1227, 1232, 108 L.Ed.2d 369 (1990).
The trial court in this case gave all of the required instructions on mitigating evidence, including instructions that the jury was the sole determiner of mitigating factors and that even if the mitigating factors were outweighed by the aggravating circumstances, they could still impose a penalty less than death.

There is no plain error here. The argument did not cause the jury to impose a sentence not supported by the evidence.

Primeaux v. State, 2004 OK CR 16, ¶¶ 90-96, 88 P.3d at 909-10.

The standard for "determining whether jury instructions violate the constitution is 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" Duvall v. Reynolds, 139 F.3d 768, 791 (10th Cir. 1998) (quoting Boyde v. California, 494 U.S. 370, 380 (1990); accord Boyd v. Ward, 179 F.3d 904, 923 (10th Cir. 1999)). "'[T]he Eighth and

Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978)) (emphasis omitted). "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." Penry v. Lynaugh, 492 U.S. 302, 319 (1989), overruled on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002). See also McKoy v. North Carolina, 494 U.S. 433, 441 (1990) (describing mitigating evidence as any evidence "the sentencer could reasonably find . . . warrants a sentence less than death"); Oregon v. Guzek, 546 U.S. 517, 526 (2006) ("The Eighth Amendment also insists that a sentencing jury be able to consider and give effect to mitigating evidence about the defendant's character or record or the circumstances of the offense.") (internal citation and quotation omitted).

Although the Oklahoma mitigating evidence jury instruction at issue has withstood federal habeas review in the context of several different claims, see Welch, 607 F.3d at 699-701 (holding that second stage jury instructions are not required to specifically instruct on particular mitigating circumstances); Boyd, 179 F.3d at 923-24 (holding that the instruction's use of the word "may" does not unconstitutionally limit a jury's consideration of mitigating evidence); see also Smith v. Mullin, 379 F.3d 919, 936-37 (10th Cir. 2004); Smallwood v. Gibson, 191 F.3d 1257, 1270-71 (10th Cir. 1999); Cooks v. Ward, 165 F.3d 1283, 1291-92

(10th Cir. 1998), Petitioner's argument differs and is without controlling precedent.  See, e.g., Welch, 607 F.3d at 699 n.9 (declining to address similar argument because petitioner failed to previously raise issue in state or federal district court).

In the instant case, after a review of all instructions given to the jury during the sentencing stage, as well as the prosecutor's closing arguments, the Court is not persuaded the OCCA's determination is contrary to, or an unreasonable application of, clearly established federal law.  To begin, it is not entirely clear that the first sentence of the instruction fails to encompass mitigating evidence relating to "any aspect of a defendant's character or record."  Eddings, 455 U.S. at 110.  Circumstances "which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" could fairly include evidence which provides a reason for a sentence less than death.  For example, finding that a defendant suffered a physically abusive childhood could serve, in fairness, sympathy, or mercy, to diminish the accused's moral culpability.[15]

Petitioner does not complain he was unable to present particular mitigating evidence.  Indeed, the trial court also instructed the jury on nine different mitigating circumstances for which Petitioner had offered evidence:

---

[15] Oklahoma changed the jury instruction at issue after the OCCA referred the instruction to the Oklahoma Uniform Jury Instruction Committee (Criminal).  Harris v. State, 2007 OK CR 28, ¶ 26, 164 P.3d 1103, 1113 (discussing concerns with improper prosecutorial argument in connection with the jury instruction).  The revised UJI takes the OCCA's concerns into account:  "Mitigating circumstances are 1) circumstances what may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposting the death penalty."  Instruction No. 4-78, OUJI-CR(2d) (2009).  Nevertheless, in the present case, neither the instruction, nor the prosecutorial argument, violated Petitioner's constitutional rights.

## CIRCUMSTANCES WHICH MAY BE MITIGATING

Evidence has been introduced as to the following mitigating circumstances:

1. Defendant experienced a childhood of extreme poverty and serious physical abuse;

2. Defendant was physically abused both by his mother and only father figure, Lewis Leroy;

3. Defendant is a caring, friendly and warm person;

4. Defendant has many family members who support and care for him;

5. Defendant is not violent when he is not under the influence of alcohol;

6. Defendant has been passive and cooperative while confined in jail or prison;

7. Defendant will do well in prison and does not pose a threat while incarcerated;

8. Defendant suffered from long term alcohol abuse; and

9. Defendant is not the person who physically stabbed the victims, nor did he intend the killings to take place, nor did he intend the use of deadly force.

(O.R. at 456.) The instruction also instructed the jurors that it "may decide that other mitigating circumstances exist, and if so, [it] should consider those circumstances as well."

(Id.) Jurors were instructed that they did not need to find a mitigating circumstance unanimously or beyond a reasonable doubt, and that aggravating factors must be found unanimously and beyond a reasonable doubt. (O.R. at 453, 455.) Jurors were also properly instructed on weighing aggravating and mitigating circumstances. (O.R. at 457.) When all

the second stage jury instructions are taken together, it is not unreasonable to conclude the jury properly considered all the relevant mitigating evidence Petitioner presented. <u>Welch</u>, 607 F.3d at 701.

The Court similarly finds no constitutionally significant impropriety in the closing arguments of the prosecutor. During closing argument, the prosecutor referenced the jury instruction at issue:

> I would ask you to focus on that line right there, mitigating circumstances extenuate or reduce the degree of moral culpability or blame. I submit to you, ladies and gentlemen, that there is not one word that you have heard on behalf of [Petitioner] – not from his sister, or his wife, or anybody else – not about his past, certainly not about the facts of this case – that one iota extenuate what he did, that to the slightest degree reduce his moral culpability or his blame.

(Tr., Vol. 9, pp. 150-51.) A further review of closing arguments indicates that the prosecutor did not ask the jury to disregard evidence that did not directly relate to Petitioner's moral culpability, but rather, argued that the evidence Petitioner offered in mitigation was insufficient to establish the existence of the enumerated mitigating circumstances. (Tr., Vol. 9, pp. 183-88.) The prosecutor stated that it was the jury's responsibility to consider all of Petitioner's evidence offered in mitigation: "And along these lines, they have asked you to consider evidence – and, indeed, its your job to consider anything they have asked you to[.]" (Tr., Vol. 9, p. 187.) The prosecutor neither misstated the law, nor improperly directed the jury to disregard relevant mitigating evidence. Petitioner has not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law. Petitioner's sixth claim for relief is denied.

7.    **Ground 7:   Whether a Jury Must Find That the Aggravating Circumstances Outweighed the Mitigating Evidence Beyond a Reasonable Doubt**

In his seventh ground for relief, Petitioner, relying on Ring v. Arizona, 536 U.S. 584 (2002), argues the failure to instruct the jury that it was required to find the aggravating circumstances outweighed the mitigating evidence beyond a reasonable doubt before it could return a sentence of death violated his Sixth, Eighth, and Fourteenth Amendment rights under the Constitution.  (Pet. at 67-70.)  According to Petitioner, the trial court's jury instructions directed the jury to make two findings of fact:  (1) whether one or more aggravating circumstances exist, and (2) whether the aggravating circumstance(s) outweigh the mitigating evidence.  (O.R. at 453, 457.)[16]  Petitioner argues a jury determination that aggravating

---

[16] The trial court gave the following instructions at the conclusion of the second stage:

**JURY'S DETERMINATION OF AGGRAVATING CIRCUMSTANCES**

Aggravating circumstances are those which increase the guilt or enormity of the offense.  In determining which sentence you may impose in this case, you may consider only those aggravating circumstances set forth in these instructions.

Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you are authorized to consider imposing a sentence of death.

If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death.  In that event, the sentence must be imprisonment for life without parole or imprisonment for life.

**WEIGHING AGGRAVATING AND MITIGATING CIRCUMSTANCES**

If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you

(continued...)

circumstance(s) outweigh the mitigating evidence is a factual determination that, under

Supreme Court precedent, must be found beyond a reasonable doubt. See Apprendi v. New

Jersey, 530 U.S. 466, 489-90 (2000) (holding that any fact that increases the penalty of a

crime beyond the statutory maximum, other than a prior conviction, must be found by a jury

beyond a reasonable doubt). See Ring, 536 U.S. at 589 (holding Apprendi applicable to

capital defendants).

Petitioner raised his claim on post-conviction. The OCCA denied relief on procedural

and substantive grounds:

> [Petitioner's] second proposition, arguing that Ring v. Arizona requires
> the jury be instructed that the aggravating circumstances must outweigh the
> mitigating evidence beyond a reasonable doubt, could have been raised on
> direct appeal as the decision in [Ring] was handed down prior to the direct
> appeal brief being filed. Therefore, Petitioner has waived this issue for review.
> Nevertheless, this issue[] was discussed and rejected in Torres v. State, 2002
> OK CR 35, ¶ 6, 58 P.3d 214, 216. We find no reason to overrule that holding
> here.

Primeaux, No. PCD-2002-632, slip op. at 4 (internal citation omitted).

In Torres v. State, the OCCA held:

> Ring describes a substantive element of a capital offense as one which makes
> an increase in authorized punishment contingent on a finding of fact. Using
> this description, the substantive element of capital murder in Oklahoma is the
> jury's finding of the aggravating circumstance necessary to support a capital

---

[16] (...continued)
also unanimously find that any such aggravating circumstance or circumstances
outweigh the finding of one or more mitigating circumstances. Even if you find that
the aggravating circumstances outweigh the mitigating circumstances, you may
impose a sentence of imprisonment for life or imprisonment for life without parole.

(O.R. at 453, 457.)

sentence. It is that finding, not the weighing of aggravating and mitigating circumstances, that authorizes jurors to consider imposing a sentence of death. That is, the increase in punishment from life imprisonment without parole to the death penalty is contingent on the factual finding of an aggravating circumstance.

2002 OK CR 35, ¶ 6, 58 P.3d 214, 216 (footnote omitted). Petitioner argues <u>Torres</u> is contrary to <u>Ring</u>'s concern that the proper inquiry is the substance, and not the form, of the factual finding. (Pet. at 69-70.) <u>Ring</u>, 536 U.S. at 602 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact–no matter how the State labels it–must be found by a jury beyond a reasonable doubt."). Because a penalty of death is authorized only if the jury unanimously finds that the aggravating circumstances outweigh the mitigating evidence, Petitioner contends that <u>Ring</u> subjects the weighing process to a beyond-a-reasonable-doubt factual finding standard.

Respondent proffers a procedural bar argument. According to Respondent, federal habeas review of Petitioner's claim is foreclosed "pursuant to an independent and adequate state procedural rule," <u>Coleman</u>, 501 U.S. at 750, because Petitioner failed to raise the claim on direct appeal despite its availability. (Resp. at 32.) However, in his application for post-conviction relief, Petitioner alleged his trial and appellate counsel were ineffective for failing to raise the claim. (<u>Petitioner's Application for Post-Conviction Relief</u>, No. PCD-2002-632, filed March 10, 2004, pp. 11-16.) Petitioner argues <u>Evitts v. Lucey</u>, 469 U.S. 387 (1985), excuses any procedural default in light of his claim of ineffective assistance of counsel. (Pet. at 23-24.) The Court declines to resolve the procedural bar question and denies relief on the merits because the issue is squarely controlled by precedent. <u>See</u> 28 U.S.C. § 2254(b)(2);

64

Miller v. Mullin, 354 F.3d 1288, 1297 (10th Cir. 2004) ("In the interest of judicial economy, 'we need not and do not address [the State's procedural bar argument], however, because the case may be more easily and succinctly [resolved] on the merits.'") (citation and alteration omitted).

In Matthews v. Workman, the Tenth Circuit reasoned that the weighing process is not a factual determination subject to Ring and Apprendi, but rather a "'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'" 577 F.3d 1175, 1195 (10th Cir. 2009) (quoting United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007)), cert. denied, ___ U.S. ___, 130 S.Ct. 1900 (2010). See also United States v. Fields, 516 F.3d 923, 950 (10th Cir. 2008) (holding "a reasonable-doubt standard is not required in the [aggravating factors and mitigating evidence] weighing process."), cert. denied, ___ U.S. ___, 129 .Ct. 1905 (2009). In light of controlling Tenth Circuit precedent, and the absence of clearly established federal law supporting Petitioner's claim for relief, the Court concludes the OCCA determination is neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. Petitioner's seventh claim for relief is denied.

## 8. Ground 8: Victim Impact Statements

During the second stage of Petitioner's trial, the State offered victim impact statements from three family members: (1) Fannie Deere, Littlecook's sister; (2) Louise Roy, Bear's sister; and (3) Sheree Counselor, Bear's daughter. (Tr., Vol. 9, pp. 22-25). Petitioner argues the introduction of the statements was unduly prejudicial and rendered his sentencing

fundamentally unfair in violation of the Fourteenth Amendment.  (Pet. at 71-75).  The Court produces the victim impact statements in their entirety:

### Fannie Deere (read by Ed Littlecook)

Warren was one of six children born to David and Marian Littlecook.  Warren was the youngest of four boys, and I (Fannie) was the youngest of six children.  Warren liked life.  He liked the animals, especially dogs.  He liked to train them.  He had two hunting dogs and used them to hunt at night.

He was a good worker and believed in making honest money.  He went to CC camp during World War II and joined the Marines voluntarily in 1943.  He served his country well and was honorably discharged in 1945.  He was well liked.  There is just so much I could say about his life.

As for the impact his loss has had on my life, I miss him.  We were close.  Either he would call me or I would call him every day.  I miss hearing his voice and speaking to him every day.  He was my only living sibling and his unexpected death has been a shock to me which I – is something I am still struggling with.  I still cry every day and have bouts of depression.  It is something I can't get over with overnight.  I still remember the shock when the police came to my door and told me that Warren was gone.  It was like a nightmare that I couldn't believe was happening.  Now, every time I see a policeman, the nightmare reoccurs.

### Louise Roy (read by Sheree Counselor)

My sister was disabled and wheelchair bound.  There wasn't very much she could do.  Her and her companion lived on a meager income and stayed home most of the time.  Once in a great while she would go to bingo or attend the pow-wow.

When she came to visit, we would all enjoy her company.  All of the children loved her.  As sisters, we were always very close.  She was younger than me, so I used to always watch over her when we were growing up.  In adulthood, I moved to California and she later came to stay with me.  My spouse was in the U.S. Navy and would leave on a nine-month tour overseas.  Living in another state and far from home, I was unbearably lonesome.  She would come and stay with me to keep me company and keep from [sic] me from being so lonesome.  I knew if I ever needed her company, she was always

near. Even now, I cannot believe she is gone. I find it unbearable to think of all the hurt she had to go through.

She was a loving person. All of the grandchildren in the family loved her. They cannot understand why she is gone. This is the ultimate hurt.

Her death has left a void in my life and now I am afraid for my life. I now cannot watch movies with any kind of violence in it. After my sister's death, I was devastated, and lot of joy has gone from my life.

Bruce Primeaux should get the death penalty.

### Sheree Counselor

My mother's main enjoyment in the last few years was reading and going to bingo. So I was always looking for books for her to read. At least two or three times a week, she would ask if I had any books she hadn't read. We went to bingo together always at the first of the month. She loved beaded earrings, makeup, clothes and getting dressed in her best for bingo.

We usually talked on the phone once a day, if not more. Actually, it would start in the afternoon. She liked to sleep during the day and stay up late at night, reading and playing solitaire. When we lived together on different occasions, we played a lot of gin rummy. She always seemed to win. There are so many things I would like to write.

She was kind and had a gentle smile. She never seemed to get angry about the way life was. She was in a wheelchair for the last years of her life. She would always listen to anything I had to say, day or night. She never had anything bad to say about any person. She gave me life. She was my confidant, my best friend.

I will never hear her voice over the phone. The pain that I feel is indescribable. I have had nightmares several times. I hear her voice in my head, "Help me, Sheree, they're hurting me." She must have been so terrified. What could she do? She had no defense. I always loved her hands. To me, she had very beautiful hands. I have been on antidepressants since this nightmare began. I see a counselor at least once a week. There was no words to describe this pain.

I have always been in favor of the death penalty and now I feel that whoever did this should receive this sentence.

(Tr. Vol. 9, pp. 22-25.)

Petitioner raises a claim for relief under Payne v. Tennessee, 501 U.S. 808 (1991). (Pet. at 74-75.) In Payne, the Supreme Court held that the Eighth Amendment does not erect a per se bar to victim impact evidence relating to the victim and the impact on the victim's family. Id. at 827, 830 n.2. However, relief may be available via the Due Process clause of the Fourteenth Amendment if the introduced evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." Id. at 825. According to Petitioner, because Payne provides the sole example of admissible victim impact evidence from the Supreme Court, any other victim impact evidence which significantly differs is inadmissible. (Pet. at 74.) This argument amounts to a request to read Payne narrowly. (Reply at 25-26.) In his argument, Petitioner does not reference which portions of the admitted statements are improper. Rather, Petitioner recites the statements, describes the victim impact evidence from Payne, and submits, "[This] case is one in which the statements admitted were so obviously unfairly prejudicial that Due Process compels relief. The emotional punch packed by the poignant statements simply provided a basis for the jury to impose death that defied rational and evenhanded administration of the death penalty." (Pet. at 75.)

Petitioner's arguments in state court on appeal were more focused. Petitioner argued Louise Roy's and Sheree Counselor's statements were more prejudicial than probative because they focused on the life of the victim and not the effect of the death on the family

of the victims. (Petitioner's Brief on Direct Appeal, No. D-2002-319, pp. 68-74.) Petitioner

also complained Ms. Counselor's references to nightmares in which Bear cries out for help

were inflammatory descriptions designed to invoke an emotional response from the jury. (Id.

at 70-71.) Petitioner argued Counselor's references to the nature of the crime were improper.

(Id.) The OCCA rejected Petitioner's arguments:

> We have previously held that victim impact evidence, which meets the
> narrowly defined definition, is relevant in a first-degree murder prosecution.
> Cargle v. State, 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, cert. denied, 519
> U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). Cargle was decided after this
> State's legislature adopted "victim impact" statutes in response to the United
> States Supreme Court's decision in Payne v. Tennessee, 501 U.S. 808, 111
> S.Ct. 2597, 115 L.Ed.2d 720 (1991).

> > [V]ictim impact evidence should be restricted to those unique
> > characteristics which define the individual who has died, the
> > contemporaneous and prospective circumstances surrounding
> > that death, and how those circumstances have financially,
> > emotionally, psychologically, and physically impacted on
> > members of the victim's immediate family.

> Cargle, 1995 OK CR 77, ¶ 75, 909 P.2d at 828. First, we find that the
> statements by Counselor properly show the emotional and psychological
> impact on her due to the death of her mother. See Le v. State, 1997 OK CR
> 55, ¶ 39, 947 P.2d 535, 551, cert. denied, 524 U.S. 930, 118 S.Ct. 2329, 141
> L.Ed.2d 702 (1998). Therefore, the statement, which was objected to at trial,
> was properly admitted.

> > [Petitioner] complains that the remaining statements deal with the life
> of Julia Bear and not the impact of [] Bear's death. [Petitioner] made a general
> objection to the victim impact statements in a written motion stating that the
> statements were substantially more prejudicial than probative. The trial court
> recognized the written motion during the hearing on the motion and stated that
> further argument was not necessary. This was sufficient to preserve this issue.

> > . . . .

[Roy's] statement was not substantially more prejudicial than probative. The statement gives a brief glimpse into the life of the victim and provides a picture "of those unique characteristics which define the individual who has died." Cargle. There was no error in the introduction of this statement.

The statement of Counselor goes into more detail about Bear's life. She states that Bear enjoyed reading and going to bingo and getting dressed up to go to bingo. They talked on the phone once a day and Bear liked to play cards. Bear was kind and gentle and was in a wheel chair the last years of her life. "She was my confidant, my best friend."

These details about Bear's life were also not substantially more prejudicial than probative. The statement was limited to the "unique characteristics which define the individual who has died." There is no error here.

Primeaux, 2004 OK CR 16, ¶¶ 104-09, 88 P.3d at 911-12.

The Court finds the OCCA's determination reasonable. In the context of referencing the victim's lives, Ms. Roy's and Ms. Counselor's statements offer brief and passing descriptions of Bear. She was described as a loving and helpful woman with close relationships with her sister and daughter to provide a brief glimpse into the life of the victim. This evidence was relevant. Payne, 501 U.S. at 827 ("A State may legitimately conclude that evidence about the victim . . . is relevant to the jury's [sentencing] decision."). Ms. Counselor's statement regarding her nightmares in which Bear cried for help is also reasonably related to the emotional impact of Bear's death. The admission of Ms. Counselor's statement did not deprive Petitioner of a fundamentally fair sentencing proceeding. See Turrentine v. Mullin, 390 F.3d 1181, 1199-1201 (10th Cir. 2004) (concluding that the OCCA decision that admission of victim impact evidence was not fundamentally unfair was not unreasonable where victim impact statement commented on

the crime); <u>United States v. Chanthadara</u>, 230 F.3d 1237, 1274 (10th Cir. 2000) (concluding admission of victim impact evidence, including emotional testimony from victim's children, picture of the victim, letters written from children to dead mother, and a child's daily journal describing the loss, did not render the proceeding fundamentally unfair).[17]  Given the overwhelming evidence of aggravating factors, evidence of Petitioner's guilt, and the trial court's instructions to the jury, the Court finds that the OCCA's determination that Petitioner was not deprived of due process was reasonable.  Petitioner's eighth claim for relief is denied.

### 9.     Ground 9:  Cumulative Effect

As his final ground for relief, Petitioner argues the accumulated effect of the errors alleged in his first eight grounds for relief rendered both his trial and penalty phase

---

[17] Petitioner did not argue on direct appeal, post-conviction relief, or on habeas, that Roy and Counselor's sentencing recommendations violated the Eighth Amendment.  <u>Payne</u> did not disturb the holding in <u>Booth</u> prohibiting "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence."  <u>Payne</u>, 501 U.S. at 830 n.2; <u>see also</u> <u>Welch</u>, 607 F.3d at 695 (noting portions of <u>Booth</u> survived the holding in <u>Payne</u>).

proceedings fundamentally unfair in violation of the Fourteenth Amendment.[18]  (Pet. at 76-79.)  Petitioner raised a cumulative error claim on direct appeal and the OCCA denied relief:

> [Petitioner] urges us to consider his proposed errors in a cumulative fashion in proposition twelve, if we find that none of them individually necessitate reversal of his conviction and sentence.  We have reviewed the case to determine the effect, if any, of [Petitioner's] alleged accumulation of error.  We find, even viewed in a cumulative fashion, the errors we identified do not require relief.  Woods v. State, 1984 OK CR 24, ¶ 10, 674 P.2d 1150, 1154.

Primeaux, 2004 OK CR 14, ¶ 110, 88 P.3d at 912.

Cumulative error may be present only "when the 'cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'"  Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003) (quoting Duckett v. Mullin, 306 F.3d 982, 992 (10th Cir. 2002)).  Because the Court has only found one harmless error (improper jury instruction on felony murder), cumulative error analysis is inapplicable.  See Barrett, 496 F.3d at 1121 (holding cumulative error requires "the existence of multiple non-reversible errors").  Petitioner's ninth ground of error is denied.

---

[18] Respondent argues there is no clearly established federal law as determined by the Supreme Court of the United States that controls Petitioner's cumulative error claim.  (Resp. at 41.)  Respondent is correct that the Supreme Court has yet to recognize a claim for reversible error based upon the aggregated effect of multiple harmless errors.  However, multiple circuit courts of appeals, including the Tenth Circuit, address claims of cumulative error on habeas review.  See, e.g., Workman, 342 F.3d at 1116-17; Hein v. Sullivan, 601 F.3d 897, 917-18 (9th Cir. 2010); Alvarez v. Boyd, 225 F.3d 820, 824-25 (7th Cir. 2000); Yohey v. Collins, 985 F.2d 222, 229 (5th Cir. 1993); but see Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002) (holding state court denial of cumulative error claim does not warrant relief under AEDPA because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").  Accordingly, the Court considers Petitioner's claim.

## IV. PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING.

In his Petition and in a separate Motion for Evidentiary Hearing (Dkt. No. 24), Petitioner makes a general request for an evidentiary hearing "as to the Petition as a whole and in particular as to any issues which involve facts not apparent from the existing record and to any issues which involve facts disputed by the State." (Pet. at 80; Reply at 28.) Requests for an evidentiary hearing are governed by 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> (A) the claim relies on–
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

A petitioner's diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Williams, 529 US. at 435.

In his general request, Petitioner does not identify an undeveloped factual basis that would entitle him to habeas relief, or which issues require additional factual support.

Without such an indication, the Court cannot determine whether Petitioner's allegations are controverted by the existing factual record. Facts necessary to address Petitioner's claims for relief are sufficiently developed in the state court and properly before this Court. Accordingly, Petitioner's request for an evidentiary hearing is denied.

## V. CONCLUSION

After a complete review of the transcripts, trial record, appellate record, record on post-conviction, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds that Petitioner is not entitled to relief.

ACCORDINGLY, Petitioner's *Petition For a Writ of Habeas Corpus by a Person in State Custody* (Dkt. Nos. 19, 21) and *Motion for Evidentiary Hearing* (Dkt. No. 24) are **DENIED**. A judgment will enter accordingly.

IT IS SO ORDERED this 7th day of October, 2010.

ROBIN J. CAUTHRON
United States District Judge